USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 95-2240 MORRIS I. GLASSMAN, et al., Plaintiffs, Appellants, v. COMPUTERVISION CORPORATION, et al., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Lynch, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ Cummings, Circuit Judge.* _____________ ____________________ Peter J. Macdonald, with whom Jeffrey B. Rudman, David E. Marder, __________________ __________________ _______________ S. Tara Miller, Hale and Dorr, Bruce D. Angiolillo, Nicholas Even, ________________ ______________ ___________________ _____________ Elisabeth Bassin, Simpson Thacher & Bartlett, Thomas J. Dougherty, _________________ ____________________________ ____________________ Dennis M. Kelleher, and Skadden, Arps, Slate, Meagher & Flom, were on __________________ _____________________________________ brief, for the defendants-appellees. Thomas G. Shapiro, with whom Michelle Blauner, Shapiro Grace __________________ _________________ ______________ Haber & Urmy, Glen DeValerio, Norman Berman, Michael Lange, Berman _____________ _______________ ______________ ______________ ______ DeValerio & Pease, Daniel W. Krasner, Peter C. Harrar, Wolf ___________________ ____________________ __________________ ____  ____________________ *Of the Seventh Circuit, sitting by designation. Haldenstein Adler Freeman & Herz, L.L.P., I. Stephen Rabin, Joseph P. _________________________________________ ________________ _________ Garland, and Rabin & Garland, were on brief, for the plaintiffs- _______ ________________ appellants. ____________________ July 31, 1996 ____________________ LYNCH, Circuit Judge. Computervision Corporation, LYNCH, Circuit Judge. _____________ a Massachusetts high technology company, made an initial public offering ("IPO") of securities on August 14, 1992. Six weeks later, on September 29, 1992, Computervision announced that its revenues and operating results for the third quarter of 1992 would be lower than expected. The prices of Computervision's stock and notes fell sharply. On the day after this announcement, the first investor suit was filed. Computervision and the IPO underwriters were sued under Sections 11 and 12(2) of the Securities Act of 1933 (the "Securities Act"). The investors also sued Computervision's principal officers and directors, alleging controlling person liability under Section 15 of the Securities Act. Plaintiffs asserted that they represented the class of investors who purchased common stock or notes between August 14, 1992 and September 29, 1992. The district court, after lengthy pre-trial proceedings and full discovery, both dismissed the case for failure to state a claim and denied as futile plaintiffs' motion for leave to file a second amended complaint. See In re Computervision ___ ____________________ Corp. Sec. Litig. ("Computervision II"), 914 F. Supp. 717, __________________ __________________ 719 (D. Mass. 1996). The investors appeal from the denial of their motion for leave to amend, arguing that their proposed second amended complaint (the "Proposed Complaint") passed the Rule -3- 3 12(b)(6) threshold. They say the Proposed Complaint adequately alleged violations of the securities laws in that the Prospectus1 for the IPO contained actionable misrepresentations,"half-truths" or omissions regarding: (1) the factors considered in determining the prices for the offerings; (2) certain mid-quarter information for the third quarter of 1992; (3) the importance of Computervision's low backlog; (4) the latest release of Computervision's key new software product, CADDS 5, which Computervision said was commercially shipping when (plaintiffs say) it was not, and the development and commercial prospects of CADDS 5. We affirm, although our reasoning as to the first claim differs from that of the district court. I. Background __________ Computervision is a leading supplier of work station-based computer aided design and computer aided manufacturing ("CAD/CAM") software and related services to the mechanical design automation market. Its software products are utilized in the design of complex parts and assemblies for the automotive, aerospace, and other mechanical industries. Its products enable users to reduce  ____________________ 1. The term "Prospectus" will be used throughout although there were two prospectuses, one for stock and one for notes. The parties treat them as identical for all material purposes.  -4- 4 the time required for designing, engineering and manufacturing a product before market introduction. This "time-to-market" is a key factor in ensuring profitability and competitiveness.2 The company was organized in 1972 under the name Prime Computer, Inc.3 Until 1988, Prime was in the business of making and selling computer systems. In 1988, Prime acquired Computervision Corporation, a leading supplier of CAD/CAM hardware and software products. In 1989, the company was acquired by DR Holdings, and shifted its focus from computer systems to the CAD/CAM market. A principal shareholder of DR Holdings, Shearson Holdings,4 provided the company with a $500 million bridge loan in connection with the acquisition. That bridge loan was intended to be repaid with the proceeds from a high-yield bond offering. However, that offering never occurred and Computervision instead  ____________________ 2. At the time of the IPO, Computervision had an installed base of 58,000 units, predominantly in North America and Europe. In 1991, international revenues accounted for approximately 66% of its total revenues. 3. The company's name was changed to Computervision Corp. at the time of the IPO at issue here. For clarity, we refer to the company as "Computervision" throughout. 4. Shearson Holdings is the parent company of a co-lead underwriter for the IPO, Shearson Lehman Brothers, Inc. In addition to Shearson Holdings and its affiliate, Shearson Lehman Brothers Capital Partners II, L.P., the principal shareholders of DR Holdings were J.H. Whitney & Co. and affiliates and the Prudential Insurance Company of America and affiliates.  -5- 5 refinanced the bridge loan with $500 million in notes. In December 1991, interest on the notes was itself converted from cash payments to payments "in kind," i.e., additional ____ notes.  The proceeds from the IPO were intended to repay half the principal amount, of the notes held by Shearson Holdings, with the rest of the debt to Shearson Holdings to be converted to Computervision common stock or written off by Shearson. Both Shearson Holdings and DR Holdings signed "lock-up" agreements, promising not to sell their equity positions in Computervision until a year after the IPO. Plaintiffs posit that Computervision's worsening financial condition5 placed Shearson Holdings' investment in jeopardy by increasing the likelihood that Computervision would default on its debt to Shearson Holdings. Allegedly, the solution was to take the company public and use the proceeds to repay a substantial portion of the debt. Plaintiffs say that defendants believed that if Computervision was not taken public during the summer of 1992, the opportunity for Shearson Holdings to recoup its investment would be lost.  ____________________ 5. In the three and a half years prior to the IPO, Computervision suffered close to $1 billion in losses. In 1989, its net losses were $281 million; in 1990, $71 million; in 1991, $461 million; and for the first six months of 1992, $143 million. Computervision's CAD/CAM revenues for the first six months of 1992 decreased by 5% from the corresponding period in 1991. However, software revenues from the CADDS line increased 10% from the corresponding period in 1991. -6- 6 On August 14, 1992, Computervision sold $600 million of securities in a registered IPO. The offering was composed of 25 million shares of common stock at $12 a share (for a total of $300 million); $125 million of 10-7/8% Senior Notes due 1997; and $175 million of 11-3/8% Senior Subordinated Notes due 1999. The Computervision IPO was a firm-commitment underwriting, in which the underwriters purchased the securities from the company and assumed the risk that the market would not accept the securities at the price set. See Shaw v. Digital Equipment Corp., 82 F.3d ___ ____ ________________________ 1194, 1200 n.1 (1st Cir. 1996). Shearson Lehman Brothers, Inc., Donaldson, Lufkin & Jenrette Securities Corp., The First Boston Corp., and Hambrecht & Quist, Inc., were the co- lead underwriters for the domestic offering, representing a syndicate of over forty firms. On September 29, 1992, six weeks after the offering, Computervision announced that its revenue and operating results for the third quarter of 1992 would be below expectations. Within a day, the stock price fell 30%, to $6.25, and the notes were trading at approximately 8% below face value.  On October 22, 1992, Computervision quantified its results for the third quarter, which ended on September 27, 1992. Computervision had suffered a net loss of roughly $88 million, including a $25 million non-recurring charge -7- 7 occasioned by its decision to lay off more than 11% of its work force. II. Description of Actions and Procedural History _____________________________________________ On September 30, 1992, one day after Computervision announced that its operating results for the third quarter of 1992 would be lower than expected, plaintiffs filed the first of eighteen separate complaints. In addition to claims under Sections 11, 12(2) and 15 of the Securities Act, plaintiffs asserted a violation of Section 10(b) of the Securities Exchange Act of 1934 and negligent misrepresentation. The eighteen actions were consolidated into one class action and on June 11, 1993, plaintiffs filed a Corrected Supplemental Consolidated Amended Class Action Complaint (the "1993 Amended Complaint").6 Among other things, the 1993 Amended Complaint alleged that the Prospectus: (i) distorted Computervision's earning trends; (ii) omitted disclosure of known uncertainties impacting upon Computervision's operating results; (iii) omitted disclosure of the increasing likelihood that Computervision would not meet its internally projected results for 1992; (iv) omitted  ____________________ 6. The 1993 Amended Complaint formally withdrew any claims of fraud under section 10(b). Nevertheless, the district court ruled that the complaint sounded in fraud and that Fed. R. Civ. P. 9(b)'s strict pleading standards applied. See In ___ __ re Computervision Corp. Sec. Litig. ("Computervision I"), 869 ___________________________________ ________________ F. Supp. 56, 63-64 (D. Mass. 1994).  -8- 8 disclosure of known declines in the demand for Computervision's services and products; and (v) omitted disclosure of software development problems. On November 23, 1993, the district court heard argument on defendants' motion to dismiss. While the motion was under advisement, discovery commenced. Discovery was extensive. Plaintiffs reviewed more than 130,000 documents and deposed over twenty witnesses. Plaintiffs have represented that, should the case be reinstated, it does not require the reopening of discovery. On November 22, 1994, the district court issued its decision, dismissing all but a sliver of the claims, primarily on the grounds that they failed to satisfy the requirements of Fed. R. Civ. P. 12(b)(6) and 9(b). See ___ Computervision I, 869 F. Supp. at 64. The district court ________________ noted that the Prospectus warned investors of the risks involved and that, with one exception, the alleged misrepresentations were made in a context that adequately "bespoke caution." Id. at 60-61. As to the omissions, the ___ court noted that these, in large part, referred either to information that was effectively disclosed, or to information for which there was no duty to disclose. Id. at 62-63. ___ On January 20, 1995, plaintiffs served a motion for leave to file a second amended complaint. Defendants served their opposition to that motion on February 24, 1995 and -9- 9 moved for summary judgment on the sole allegation surviving the district court's 1994 decision.7 The parties then entered into a Stipulation of Dismissal, dismissing, with prejudice, the surviving claim. The stipulation was to be effective the day after the district court ruled on the _____ motion for leave to amend.  On May 1, 1995, plaintiffs moved for leave to file the Proposed Complaint at issue here. The court heard argument on September 13, 1995, and a week later, on September 20, denied the motion for leave to amend. The basis for the denial was futility, in that the Proposed Complaint failed to state a claim pursuant to Rule 12(b)(6). The court dismissed the case, entered judgment for the defendants, and promised a full opinion. Plaintiffs filed their notice of appeal on October 20, 1995. Subsequently, on February 12, 1996, the district court issued an opinion setting forth the rationale underlying its September 1995 order. Computervision II, 914 _________________ F. Supp. at 717-22. The one claim that had given the district court pause at oral argument was the allegation that the Prospectus had misrepresented that the securities were "appropriately" priced. The district court nevertheless ruled  ____________________ 7. Pursuant to the parties' Rule 16.1(D) Joint Statement filed December 28, 1994, plaintiffs' proposed amended complaint and summary judgment motions were served but not filed with the court. -10- 10 that that claim failed because: (a) the Prospectus had not warranted or insured the appropriateness of the securities' prices; and (b) the claim was keyed to the nondisclosure of internal projections, which were not required to be disclosed in any event. Id. at 719-20. The district court ruled that ___ plaintiffs' other misrepresentation claims, relating to backlog and CADDS 5, failed because they were based on unreasonable inferences drawn by reading statements in the Prospectus out of context.8 Id. at 719-22. This appeal ___ followed. III. Analysis ________ A. Standard of Review __________________ This appeal lies from the district court's denial of plaintiffs' motion to file an amended complaint. The motion was denied after full discovery and after the dismissal of an earlier complaint. The district court ruled that amendment would be futile. The parties disagreed then, as they do now, over the proper standard for analyzing this motion to amend. See id. at 719. Plaintiffs argued that ___ ___ leave to amend should be "freely given when justice so requires," Fed. R. Civ. P. 15(a). Computervision II, 914 F. _________________  ____________________ 8. Since there were no actionable misstatements or omissions, the court held that the negligent misrepresentation claim against the underwriters failed as well. Computervision II, 914 F. Supp. at 722. _________________ -11- 11 Supp. at 719. Defendants embraced the more stringent "substantial and convincing evidence" standard set forth in Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. _______________________ ____ 1994). Computervision II, 914 F. Supp. at 719. The district _________________ court did not decide the issue, finding the question academic "as the plaintiffs cannot maintain this action under either standard." Computervision II, 914 F. Supp. at 719. _________________ Denial of a motion to file an amended complaint is reviewed for abuse of discretion. See Romani v. Shearson ___ ______ ________ Lehman Hutton, 929 F.2d 875, 880 (1st Cir. 1991); Arazie v. ______________ ______ Mullane, 2 F.3d 1456, 1464-65 (7th Cir. 1993) (noting, _______ however, that the relevant pleading standards must be kept in mind when applying the abuse of discretion standard). Rule 15(a) provides that "leave [to amend] shall be freely given when justice so requires." Unless there appears to be an adequate reason for the denial of leave to amend (e.g., undue ____ delay, bad faith, dilatory motive, futility of amendment, prejudice), we will not affirm it. Grant v. News Group _____ __________ Boston, Inc., 55 F.3d 1, 5 (1st Cir. 1995).  ____________ Here, there was no finding that plaintiffs acted in bad faith, or in an effort to prolong litigation. Nor was there a finding that defendants would have been prejudiced by -12- 12 the amendment.9 See Ward Electronics Serv., Inc. v. First ___ _____________________________ _____ Commercial Bank, 819 F.2d 496, 496-97 (4th Cir. 1987).  _______________ Rather, the dismissal rested on other grounds. The district court's order explicitly states: "the motion to further amend the complaint is denied as futile." "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted. See 3 Moore's ___ _______ Federal Practice 15.08[4], at 15-80 (2d ed. 1993); see also ________________ ___ ____ Vargas v. McNamara, 608 F.2d 15, 17 (1st Cir. 1979). In ______ ________ reviewing for "futility," the district court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion. 3 Moore's, at 15.08[4], at 15-81. _______ The Gold standard, which requires that proposed ____ amendments have substantial merit and be supported by substantial and convincing evidence, is inapplicable for several reasons. To date, it has only been applied where the motion to amend is made after a defendant has moved for _____ summary judgment. See e.g., Gold, 30 F.3d at 253; Torres- ___ ____ ____ _______ Matos v. St. Lawrence Garment Co., 901 F.2d 1144, 1146 (1st _____ _________________________  ____________________ 9. It is unlikely that defendants could have been prejudiced. Plaintiffs have represented that the allegations of the Proposed Complaint do not require reopening discovery. There is also no claim that defendants would need additional time to change their trial strategy in light of the proposed amendment. Cf. Tiernan v. Byth, Eastman, Dillon & Co., 719 ___ _______ ____________________________ F.2d 1, 4-5 (1st Cir. 1983) (finding prejudice even where additional discovery was not necessary; the additional claims "may well have affected defendants' planned trial strategy and tactics" and both defendants and the court would likely have "required additional time to prepare for trial"). -13- 13 Cir. 1990); Cowen v. Bank United of Texas, FSB, 1995 WL _____ ___________________________ 38978, *9 (N.D. Ill.), aff'd 70 F.3d 937 (7th Cir. 1995); _____ Carey v. Beans, 500 F. Supp. 580, 582 (E.D. Pa. 1980), aff'd, _____ _____ _____ 659 F.2d 1065 (3d Cir. 1981); Artman v. International ______ _____________ Harvester Co., 355 F. Supp. 476, 481 (W.D. Pa. 1972). In _____________ that context, a plaintiff's motion to amend is an attempt to alter the shape of the case in order to defeat summary judgment. Here plaintiffs served the motion to amend before ______ defendants moved for summary judgment. Further, the claims in the summary judgment motion were dropped by agreement of _________ the parties and, as a result, no summary judgment motion was pending when the district court considered the motion to amend. Nor does Gold apply by analogy. This is not a ____ situation in which plaintiffs seek amendment solely to avert imminent defeat. Cf. Cowen v. Bank United of Texas, FSB, 70 ___ _____ __________________________ F.3d 937, 944 (7th Cir. 1995). Nor is this a situation in which it is rational to presume that defendants would be prejudiced by amendment. Cf. Carey v. Beans, 500 F. Supp. at ___ _____ _____ 582 (calling prejudice to non-movant the "`touchstone for the denial of the amendment'" (quoting Cornell & Co. v. OSHA, 573 _____________ ____ F.2d 820, 823 (8th Cir. 1978)). Although, under these circumstances, plaintiffs could be guilty of undue delay or prejudice to defendants might exist, the district court made -14- 14 no such finding. Further, the district court did not rely on Goldandits reasoningwas almostpurelya legalfutility analysis. ____ Thus, we look at whether the district court correctly determined that the Proposed Complaint failed to meet the pleading standards of Rule 12(b)(6). There is no practical difference, in terms of review, between a denial of a motion to amend based on futility and the grant of a motion to dismiss for failure to state a claim. See Motorcity of ___ _____________ Jacksonville, Ltd. v. Southeast Bank, 83 F.3d 1317, 1323 ___________________ ______________ (11th Cir. 1996); see also Keweenaw Bay Indian Community v. ___ ____ ______________________________ Michigan, 11 F.3d 1341, 1348 (6th Cir. 1993). Review is de ________ __ novo. See, e.g., Serabian v. Amoskeag Bank Shares, Inc., 24 ____ ___ ____ ________ __________________________ F.3d 357, 361 (1st Cir. 1994) (motions to dismiss are reviewed de novo). __ ____ B. Securities Law Claims _____________________ "Sections 11 and 12(2) are enforcement mechanisms for the mandatory disclosure requirements of the Securities Act." Shaw, 82 F.3d at 1201. Section 11 imposes liability ____ on signers of a registration statement and on underwriters, among others, if the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C.  77k(a). Section 12(2) provides that any person who "offers or sells" a security by means of a prospectus or oral -15- 15 communication that contains a materially false statement or that "omits to state a material fact necessary to make the statements, in the light of the circumstances under which they were made, not misleading" shall be liable to any "person purchasing such security from him." 15 U.S.C.  77l(2). As we said in Shaw, there is a strong affirmative ____ duty of disclosure in the context of a public offering. 83 F.3d at 1202. The same may be even more emphatically true in an initial public offering, where the securities have not before been publicly traded. Cf. Marcel Kahan, Securities ___ __________ Laws and the Social Costs of "Inaccurate" Stock Prices, 41 _________________________________________________________ Duke L.J. 977, 1014-15 (1992). But the main thrust of plaintiffs' claims is not based on any duty to disclose. Rather, they say that this is primarily an affirmative misrepresentation or half-truth case. The Proposed Complaint centers on the claim that Computervision affirmatively misrepresented that the offering price was set after the exercise of due diligence by the underwriters, but that in fact the diligence exercised was deficient in that the most current information was not considered. In addition, plaintiffs contend that the Prospectus omitted certain mid-quarter information for the third quarter of 1992 and contained material misstatements or -16- 16 omissions regarding Computervision's backlog and the state of its latest software product, CADDS 5.  The district court held that the Prospectus would not bear the characterizations plaintiffs sought to place on it, and that the allegedly actionable "representations" were no more than unreasonable inferences drawn by plaintiffs and unsupported by the surrounding language. Computervision II, _________________ 914 F. Supp. at 719. Plaintiffs argue that the district court erred and that they should have been allowed to amend their complaint. Defendants respond by asserting that plaintiffs' pricing claims reduce to an argument that the securities were mispriced because their prices fell subsequent to the offerings, and that the omission of mid-quarter information claims reduce to nothing more than an argument that Computervision was required to disclose its internal forecasts. Plaintiffs' position, defendants say, is _________ untenable because the securities laws impose no duty upon a company to either provide a warranty as to price or to disclose internal projections. They also say that the alleged misstatements concerning backlog and CADDS 5 are not actionably misleading when considered in the context of the Prospectus as a whole.  1. Pricing/Due Diligence Claims ____________________________ -17- 17 The Computervision IPO was unusual in one respect which has bearing on plaintiffs' claims. Computervision had been owned by an entity, one of whose principal shareholders, Shearson Holdings, was affiliated with one of the co-lead underwriters, Shearson Lehman Brothers. As a result, the Prospectus informed investors: Under the provisions of Schedule E to the By-laws of the National Association of Securities Dealers Inc. ("NASD"), when NASD members such as Shearson Lehman Brothers Inc., participate in the distribution of an affiliate's securities, the public offering price can be no higher than that recommended by a "qualified independent underwriter" meeting certain standards. Hambrecht & Quist (for the stock) and Donaldson Lufkin and First Boston (for the notes) assumed the obligations of due diligence as to the public offering prices, and the Prospectus explicitly represented that they had done so. This representation in the Prospectus is significant in two respects. First, the fact that one of the lead underwriters was affiliated with a principal shareholder of Computervision arguably gave that underwriter a reason to inflate the offering prices. Second, the Prospectus, in effect, explicitly assured the members of the investing public that, despite the link between Shearson Holdings and Shearson Lehman Brothers, they had no reason to fear an inflated price. The Prospectus made a selling point out of the fact that independent underwriters had performed due -18- 18 diligence, set maximum prices, and thus acted as gatekeepers against possible misdeeds by Shearson Holdings and Shearson Lehman Brothers. Cf. John C. Coffee, Re-Engineering ___ ______________ Corporate Disclosure: The Coming Debate Over Company _____________________________________________________________ Registration, 52 Wash. & Lee L. Rev. 1143, 1168 (1995). ____________ (i) The Pricing Claims in the Proposed Complaint  ____________________________________________ The Prospectus described the process by which Computervision and its underwriters arrived at prices for the offering: Prior to the Share Offerings there has been no public market for the Common Stock. The initial public offering price was determined by negotiation among the Company, the Representatives and the Lead Managers. Among the factors considered in determining the initial offering price, in addition to prevailing market conditions, was the Company's historical performance, estimates of the business potential and earnings prospects of the Company and market prices of and financial and operating data concerning comparable companies. These representations are at the heart of the Proposed Complaint, which alleges in paragraphs 3(a) and 45, respectively: The Stock Prospectus was misleading in stating that the Stock had been appropriately priced. The price of the Notes was also too high, causing their yields to be too low. The Stock ___________ Prospectus stated that among the factors _________________________________________ considered in determining the initial _________________________________________ public offering price were "estimates of _________________________________________ the business potential and earnings _________________________________________ prospects of the Company." By the time _________________________________________ of the Offerings, however, those _________________________________________ -19- 19 estimates were no longer valid. As of ________________________________ the date of the Offerings, the Company's revenues, bookings, visibility and backlog were all substantially below the plan prepared by Computervision and reviewed by the underwriters in connection with their due diligence and pricing for the Offerings (the "IPO Plan"), as well as the Company's other internal plans and forecasts (emphasis added) (footnotes omitted). The Stock Prospectus represented that the initial public offering price for the Stock was based upon, among other things, "estimates of the business potential and earnings prospects of the Company . . ." The Prospectuses also stated that "qualified independent underwriters" had recommended the initial public offering price for the Shares and the yields on the Notes. Those formal, written recommendations were based on factors including "estimates of the business potential of the company" and on the "economic, market, financial and other conditions" as they existed on August 13, 1992, the day before the effective date of the Offerings. Contrary to the representations in the Prospectuses, the price of the Shares and the yields on the Notes did not properly reflect the business potential, earnings prospects or financial condition of Computervision as of that date.10  ____________________ 10. Related allegations are found at paragraphs 46 and 84 of the Proposed Complaint, respectively:  As of the date of the Offerings, all of Computervision's internal planning and forecasting devices showed that results during the first seven weeks of the Third Quarter were substantially below the budgets set in the Company's internal plans and the IPO Plan which the Company had presented to the Underwriters in conjunction with their due diligence and pricing of the Offerings. In particular, -20- 20  ____________________ at the time of the Offerings, Computervision's U.S. sales were materially below sales at comparable points in the prior five quarters. Both U.S. and international sales were substantially below the Company's plans. In addition, Computervision had a $40 million shortfall in visible orders needed to reach its quarterly budget. The Underwriters failed to perform adequate due diligence on Computervision's actual revenues, sales, orders, bookings and visibility for the seven weeks during the Third Quarter before the Offerings. The Underwriters _________________ were required to but did not obtain _________________________________________ information necessary to verify the _________________________________________ Company's false statements that such _________________________________________ results were "more or less where they _________________________________________ were expected to be." To the extent the _________________________________________ Underwriters obtained any information _________________________________________ from the Company concerning these _________________________________________ results, the Stock and Notes were _________________________________________ mispriced because the initial offering _________________________________________ price and the yields, as well as _________________________________________ Underwriters' recommendations, did not _________________________________________ take into account these low levels of _________________________________________ sales and the $40 million order _________________________________________ shortfall. Therefore, the representation __________ in the Stock prospectus that the offering price was based upon "estimates of the business potential and earnings prospects of the Company" was false and misleading, as were the representations in the Prospectuses concerning the recommendations of the qualified independent underwriters (emphasis added). The Underwriters failed to perform adequate due diligence on the Company's actual sales, orders, bookings, visibility and backlog for the first seven weeks of the Third Quarter before the Offerings. The Underwriters were ______________________ required to but either failed to obtain _________________________________________ and review or ignored information about _________________________________________ actual sales, orders, bookings, _________________________________________ -21- 21 Different claims, which require different analyses, appear to be asserted in these paragraphs. (ii) District Court's Characterization of the _____________________________________________ Pricing Claims ______________ In dismissing the action, the district court characterized plaintiffs' claim as being that the prices set ______ for the securities were inappropriate. Computervision II, _________________ 914 F. Supp. at 720. The district court noted that the Prospectus never represented that the prices were "appropriate" and that if the Prospectus language quoted in paragraph 48 of the Proposed Complaint: constitutes a representation that the initial price was 'appropriate,' investors would effectively have insurance against any decline in price, rendering their investments risk-free. Id. We agree with the district court's view of any claim ___ plaintiffs make that the Prospectus represented that the price itself was appropriate. We note, however, that plaintiffs vigorously deny that such was, or is, their claim.  ____________________ visibility and backlog necessary to _________________________________________ verify the Company's statements that they _________________________________________ were more or less on track. As a result, __________________________ the Stock and Notes were mispriced because the initial offering price of the Stock and the yields on the Notes did not take into account these adverse results, including the $40 million order shortfall (emphasis added). -22- 22 The price set for an offering of securities is essentially a forecast. Price can be characterized as a present value calculation of the firm's future streams of earnings or dividends. See In re VeriFone Sec. Litig. ___ _____________________________ ("VeriFone I"), 784 F. Supp. 1471, 1479 (N.D. Cal. 1992) ___________ ("securities prices on national exchanges reflect . . . the expected future cash flows from the security"), aff'd, 11 _____ F.3d 865 (9th Cir. 1993); Richard A. Brealey and Stewart C. Myers, Principles of Corporate Finance, 61-63 (4th ed. 1991); _______________________________ cf. Niagara Hudson Power Corp. v. Leventritt, 340 U.S. 336, ___ ___________________________ __________ 339 & n.7 (1951) (approving the SEC's valuation of warrants in terms of current expectations of future events); Pommer v. ______ Medtest Corp., 961 F.2d 620, 623 (7th Cir. 1992) _______________ ("[p]robabilities determine the value of stock"); Wielgos v. _______ Commonwealth Edison Co., 892 F.2d 509, 514 (7th Cir. 1989) ________________________ (investors value securities on the basis of how they believe the firm will do in the future, and not on past performance). Since price is only a forecast of the firm's future performance, it is not actionable merely because the forecast, in hindsight, does not turn out to be correct. See ___ In re VeriFone Sec. Litig. ("VeriFone II"), 11 F.3d 865, 871 ___________________________ ___________ (9th Cir. 1993) (earnings forecasts made on reasonable basis not actionable); Wielgos, 892 F.2d at 518; Marx v. Computer _______ ____ ________ Sciences Corp., 507 F.2d 485, 489-90 (9th Cir. 1974). _______________ Forecasts are not guarantees of, or insurance policies for, a -23- 23 firm's future performance, nor are they understood as such by reasonable investors. Kowal v. MCI Communications Corp., 16 _____ ________________________ F.3d 1271, 1276 (D.C. Cir. 1994); Raab v. General Physics ____ _______________ Corp., 4 F.3d 286, 290 (4th Cir. 1993). Hence, to the extent _____ plaintiffs' "price" claim rests on either the fact that the initial offering prices fell shortly after the offering or the fact that Computervision's third quarter earnings turned out to be worse than expected, it fails.11 Cf. Pommer, 961 ___ ______ F.2d at 623 ("[S]ecurities laws approach matters from an ex __ ante perspective."). ____ (iii) Plaintiffs' Characterization of the Pricing _____________________________________________ Claims ______ Plaintiffs, however, argue that their attack is not on the appropriateness of the offering prices themselves. Instead, they assert that their claim before the district court was that the Prospectus materially misrepresented that:  ____________________ 11. In addition, when the Prospectus statements about price are read in context, they appear to be anything but a guarantee. First, the Prospectus provided investors with _________ explicit and specific warnings as to factors that might cause the prices of the securities to fall. Second, the Prospectus cautioned investors as to the possibility that no market for the securities would develop or be sustained after the offering. These cautionary statements in the Prospectus are, in and of themselves, reason to find this claim not actionable. See Shaw, 82 F.3d at 1213 ("when statements of ___ ____ `soft' information such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the `soft' statements may not be materially misleading"); In re Donald J. Trump Casino _____________________________ Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993)(same).  ___________ -24- 24 (a) certain types of information were considered by the underwriters and Computervision in determining prices for the offering, when, in fact, the most current information of those types was not considered (or, if considered, was ignored); and (b) the underwriters did due diligence in estimating the prices, when they did not because they did not consider the most current information. As a threshold matter, the explicit statements in ________ the Prospectus that certain factors were considered and that due diligence was done are required by law to be true as of _____ the effective date of the offering. See 15 U.S.C. 77k(a) ___________________________________ ___ (liability attaches for misstatements in a prospectus at the time such part becomes effective); see also 3A Harold S. ___ ____ Bloomenthal, Securities and Federal Corporate Law 8.23, at _____________________________________ 8-102 (1993) ("[T]he prospectus for purposes of section 11 speaks as of the date the registration statement becomes effective."). Thus, plaintiffs assert that, to the extent current information up to the date of the offering was not incorporated into the prices, the statements in the Prospectus presented a misleading half-truth because they suggested that the underwriters and Computervision took into consideration current estimates of business potential and _______ earnings prospects. Cf. Virginia Bankshares v. Sandberg, 501 ___ ___________________ ________ U.S. 1095, 1098 (1991) (literally accurate statement deceptive because only a half-truth). As a general matter, -25- 25 we agree that such a theory, if sufficiently supported, could make out a viable legal claim. It may be asked whether the alleged misstatements are actionable, given that they were made in the context of offering prices, which as noted, are essentially forecasts of future earnings. While forecasts are not actionable merely because they do not come true, they may be actionable to the extent they are not reasonably based on, or are inconsistent with, the facts at the time the forecast is made. See Kowal, ___ _____ 16 F.3d at 1278; cf. Virginia Bankshares, 501 U.S. at 1093-94 ___ ___________________ (board of directors' statement that merger price was "fair" was actionable to the extent it was not based on, or was inconsistent with, existing and available facts); Serabian, ________ 24 F.3d at 361 ("predictions about the future that prove to be off the mark likewise are immunized unless plaintiffs meet their burden of demonstrating intentional deception"); Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir.) (prediction _________ ______ violates securities laws if it is made without a genuine belief or reasonable basis), cert. denied, 474 U.S. 946 _____ ______ (1985); Billard v. Rockwell Int'l Corp., 683 F.2d 51, 56-57 _______ ____________________ (2d Cir. 1982) ("Although the fairness of the offering price is not a valid basis for an action under Sections 10(b) and 14(e) . . . , a statement that experts have examined the price and certified it as fair may well be a material -26- 26 misrepresentation if those experts have advised the offeror that the price is unfair.").  The types of data which the plaintiffs allege should have been considered are, in general terms, within the realm of data relevant to the determination of price. The alleged misstatement as to factors that were considered, as of the effective date of the offering, lists the following factors: (i) the company's historical performance; (ii) estimates of the business potential and earnings prospects of the company; and (iii) market prices of, and financial and operating data concerning, comparable companies with publicly traded equity securities. This list of factors is, in effect, a laundry list of general factors that would likely be considered in any reasonable estimation of price. Cf. ___ Lucian Arye Bebchuk and Marcel Kahan, Fairness Opinions: How ______________________ Fair Are They And What Can Be Done About It, 1989 Duke L. J. ____________________________________________ 27, 34-35 (1989) (listing methods of estimating fair price); cf. generally Ronald J. Gilson and Reinier H. Kraakman, The ___ _________ ___ Mechanisms of Market Efficiency, 70 Va. L. Rev. 549 (1984) ________________________________ (describing the types of information that are incorporated into securities prices). Therefore, if the defendants did not actually consider current information in the broad categories of data they claimed to have looked at, it is possible that plaintiffs would have a reasonable basis claim. -27- 27 The due diligence claim also comes down to one that the setting of the price was done without a reasonable basis.12 The statement in the Prospectus that the independent underwriters conducted due diligence was an affirmative statement that a reasonable investigation of the ___________ company was done and that, using that and other relevant information, a fair price was estimated. See 15 U.S.C.  ___ 77k(b)(3) (due diligence defense under Section 11 requires "reasonable investigation") & 77l(2) (due diligence under Section 12 defined as "exercise of reasonable care"); Software Toolworks, 50 F.3d at 621 (9th Cir. 1994) (noting ___________________ that the two articulations of due diligence are "similar," if not identical).  The law on due diligence is sparse, but for our purposes it makes clear that certain inactions may constitute a failure to perform due diligence. First, a failure to continue to investigate the company up to the effective date _________________________ of the offering is likely to be a failure to do due _________________ diligence. See Software Toolworks, 50 F.3d at 625 & n.2 ___ __________________ (intra-quarterly information available before the effective date of offering not taken into account by underwriters); Escott v. BarChris Constr. Corp., 283 F. Supp. 643, 690 ______ _______________________  ____________________ 12. Due diligence is equivalent to non-negligence. See ___ Ernst & Ernst v. Hochfelder, 425 U.S. 185, 208 (1975); In re _____________ __________ _____ Software Toolworks Inc. Sec. Litig., 50 F.3d 615, 621 (9th _____________________________________ Cir. 1994), cert. denied, 116 S. Ct. 274 (1995).  _____ ______ -28- 28 (S.D.N.Y. 1968) (where registration statement became effective on May 16, 1961, attorney did not make reasonable investigation where he failed to discover that statements made in January had become inaccurate by May); see also 3A ___ ____ Bloomenthal, Securities and Federal Corporate Law, 8.23, at ____________________________________ 8-102-03. Second, it also may be a failure of due diligence to rely solely on management representations as to the state of the company where those representations can reasonably be verified. See Software Toolworks, 50 F.3d at 625-26 ___ ____________________ (inadequate for underwriters to rely on company's assurances as to its financial condition where underwriters had access to all available information); BarChris, 283 F. Supp. at 696- ________ 97 ("underwriters must make some reasonable attempt to verify the data submitted to them"). Notwithstanding these generalities, the specifics of plaintiffs' factual claims must be scrutinized. (iv) Rule 12(b)(6) _____________ The next and dispositive question is whether there are sufficient factual allegations as to plaintiffs' theory in the Proposed Complaint for it to survive a Rule 12(b)(6) motion. We are mindful that the case comes to us after over three years of litigation and full discovery. We thus look more closely at the factual allegations to see if they support the legal conclusions pled. As this court said in -29- 29 Resolution Trust Corp. v. Driscoll, 985 F.2d 44 (1st Cir. ______________________ ________ 1993): It is, of course, true that at the start of complex litigation a party may not have all the facts, so courts normally hesitate to dismiss under Fed. R. Civ. P. 12(b)(6) at the outset. At the start, a reasonable basis for belief and an outline of what one might reasonably hope to prove may suffice to permit discovery and ward off premature motions to dismiss. But [plaintiff's] complaint against [defendant] is deficient; this litigation has persisted for almost two years; and yet even now [plaintiff] is unable to explain what exactly [defendant] did that is wrongful . . . [plaintiff still has not supplied] a single, coherent, specific description of what [defendant] has done that is wrongful.  Id. at 48. A complaint must contain "factual allegations, ___ either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 ______ _______________ (1st Cir. 1988); see also Fleming v. Lind-Waldock & Co., 922 ___ ____ _______ __________________ F.2d 20, 24 (1st Cir. 1990); cf. Dewey v. University of New ___ _____ _________________ Hampshire, 694 F.2d 1, 3 (1st Cir. 1982) ("it is not enough _________ to allege a general scenario which could be dominated by unpleaded facts"), cert. denied, 461 U.S. 944 (1983); cf. _____ ______ ___ also Murphy v. United States, 45 F.3d 520, 522 (1st Cir. ____ ______ _____________ 1995); Coyne v. City of Somerville, 972 F.2d 440, 444 (1st _____ ___________________ Cir. 1992); Correa-Martinez v. Arrillaga-Belendez, 903 F.2d _______________ __________________ -30- 30 49, 52 (1st Cir. 1990).13 "In deciding a motion to dismiss under Rule 12(b)(6), [we] must take all well-pleaded facts as true, but [we] need not credit a complaint's `bald assertions' or legal conclusions." Shaw, 82 F.3d at 1216 ____ (citations omitted). Plaintiffs' legal theory breaks down into two elements: (i) that defendants explicitly stated that the prices had been set after a reasonable investigation and the reasonable consideration of relevant facts; and (ii) that such an investigation was not done and the relevant facts were not considered (or were ignored).14 But plaintiffs' factual pleadings fail to convince us that they have stated a claim that relevant information was not considered. a. Failure to Consider Data  ________________________ It is true that a failure by the underwriters either to verify a company's statements as to its financial  ____________________ 13. Defendants argue that the Proposed Complaint sounds in fraud and hence we should apply Fed. R. Civ. P. 9(b), which requires that claims of fraud be pled with "particularity." See Shaw, 82 F.3d at 1223 (although Section 11 and 12(2) ___ ____ claims do not require allegations of scienter and reliance, the claims may yet sound in fraud). Since the Proposed Complaint fails to meet even the lower threshold of Rule 12(b)(6) in the procedural posture in which it comes to us, we do not decide whether Rule 9(b) is applicable.  14. Facts or information may be "required" to be considered (e.g., if a company affirmatively represents that such was ____ considered) but do not necessarily have to result in a reduction or increase in the offering price. The investment bankers and/or company may well look at the information and reasonably think that it has already been anticipated and incorporated into the price. -31- 31 state or to consider new information up to the effective date of an offering would almost certainly constitute a lack of due diligence. See Software Toolworks, 50 F. 3d at 625-26 & ___ __________________ n.2. However, it is plaintiffs' responsibility to plead factual allegations, not hypotheticals, sufficient to reasonably allow the inference that the defendants actually did not consider the up-to-date data as of the offering date. Cf. Lefkowitz v. Smith Barney, Harris Upham & Co., 804 F.2d ___ _________ ________________________________ 154, 156 (1st Cir. 1986) (rejecting plaintiff's suggested inferences as insufficiently grounded in fact). Here, plaintiffs provide none. Plaintiffs' 1993 Amended Complaint acknowledged that the "Stock Offering Price was twice lowered from its initial $19 per share price [as of May 1992] to its final price of $12 per share" in August 1992. Plaintiffs suggest that these downward adjustments in price reflected the disappointing results for the second quarter of 1992, but not the negative information from the first seven weeks of the third quarter of 1992. However, plaintiffs' claim that data from the first seven weeks of the third quarter was ignored both lacks factual support and is belied by context. Not only did Computervision and the underwriters lower the initially planned stock offering price by more than 30%, but the Prospectus abounds with warnings that the market price might dip lower once trading commenced. The Prospectus -32- 32 explicitly warned that an investment in the securities involved a high degree of risk; that Computervision was highly leveraged; that it operated in a highly competitive environment and that its products might not be accepted by customers; and that there had been a history of significant losses for at least three years. As discussed, price is essentially a forecast of future earnings. Reducing the price from $19 to $12 showed a reduced expectation of future ___________________ earnings. Plaintiffs give us no basis from which to infer that this reduction in price factored in the disappointing second quarter results, but did not incorporate the information from the first seven weeks of the third quarter.15 Additionally, the cautionary language as to potential price drops belies plaintiffs' claim that certain disappointing third quarter information was not considered.   ____________________ 15. Plaintiffs' own Proposed Complaint states that pricing meetings were held up to August 13, 1992, the day before the offering, and that the $12 price was established at a meeting on that day. Similarly, the price recommendations of the independent underwriters were not delivered until August 13, 1992. Plaintiffs, in paragraphs 51 through 60 of the Proposed Complaint, purport to describe the pricing process that Computervision and its underwriters went through. These paragraphs mention an IPO Plan prepared by Computervision as one of the pieces of data considered by the underwriters in ___ their due diligence work. The Proposed Complaint alleges that the IPO Plan did not fully reflect the information as to the first seven weeks of the third quarter of 1992. However, we cannot reasonably infer that the alleged shortcomings of the IPO plan (or other company forecasts) mean that the _______ underwriters did not consider up-to-date information. ____________ -33- 33 Furthermore, the factual context of the offerings provides no support for the inference plaintiffs seek to draw. Here the offering was conducted pursuant to a firm- commitment underwriting, in which the underwriters bore all the initial risk that the offering prices may have been set too high.16 Further, as part of the offering, both Shearson Holdings and DR Holdings agreed to lock up their Computervision stock holdings for an entire year after the offerings, thereby decreasing any incentive they would have had to inflate the short-term stock price as of the offering date. It has been over three years since the first complaint in this case was filed and plaintiffs have been allowed full discovery. In this procedural setting,  ____________________ 16. Although one of the lead underwriters, Shearson Lehman ___ Brothers, was affiliated with a principal shareholder of Computervision, the offering also involved three other lead ________________ underwriters, Donaldson Lufkin, First Boston, and Hambrecht & ____________ Quist (who also played the roles of qualified independent underwriters). Each had both monetary and reputational capital at risk in the offerings. Cf. Brealey and Myers, ___ Corporate Finance, at 351. Further, the lead underwriters _________________ represented a syndicate of over forty underwriters. There is not enough here for us to draw an inference of inadequate diligence on the part of the underwriters. Cf. Harold S. ___ Bloomenthal, Going Public Handbook, 3.04[4], at 3-20 _______________________ (1996)(underwriters look for a price that assures that the offering will be oversubscribed); James D. Cox, Robert W. Hillman and Donald C. Langevoort, Securities Regulation, 236- _____________________ 37 (1991) (empirical research on IPOs shows that initial offering prices tend to be systematically lower than the short-term aftermarket prices, arguably because underwriters want both insurance against lawsuits and to ensure that the offering is oversubscribed).  -34- 34 plaintiffs' bald and factually unsupported hypothesis that the underwriters failed to obtain and use up-to-date information is not, standing alone, sufficient. Cf. ___ Driscoll, 985 F.2d at 48 (dismissal proper where after almost ________ two years of litigation plaintiffs' complaint contained no factual allegations to support its legal conclusions); Dewey, _____ 694 F.2d at 3-4 (dismissal proper where plaintiff, despite having eight months to make original complaint more specific, was not able to "fill in the gaps" in a "skeletal set of bland allegations"); Gooley, 851 F.2d at 515 (if, "despite ______ multiple opportunities to finetune the complaint, a naked conclusion, unanchored in any meaningful set of factual averments" is the asserted basis for relief, dismissal may follow).  In essence, all the Proposed Complaint alleges is that, by the close of trading on September 30, 1992, the prices of Computervision's securities fell because of an announcement on September 29 that third quarter earnings were going to be lower than expected. However, the assertion that the future fell below projections is not enough in itself to render the projection actionable. See Kowal, 16 F.3d at 1278 ___ _____ (failure to meet performance projections "supports no inference" that projection lacked a reasonable basis when made); cf. Virginia Bankshares, 501 U.S. at 1092-94 ___ ____________________ (describing the type of hard, contemporaneous facts that -35- 35 could show a statement about the adequacy of price to be false). A ruling to the contrary would magnify the risk of nuisance litigation.17 The district court was justified in viewing the Proposed Complaint's pricing claims as no more than an attempt to seek a warranty of the accuracy of price, and therefore as insufficient. Computervision II, 914 F. _________________ Supp. at 720. Rule 12(b)(6) may set a low threshold, but it is real. Gooley, 851 F.2d at 514. ______ 2. Mid-Quarter Information  _______________________ Plaintiffs assert that, as of week seven of the third quarter of 1992, the following intra-quarterly information was known, and should have been disclosed: (i) third quarter domestic bookings18 were only about 24% of _______ Computervision's internal forecasts for those weeks, and _____________________________________ significantly below bookings at comparable points in the past five quarters; (ii) Computervision's international sales were ____ also short of internal forecasts; and (iii) Computervision _________________________________ had a shortfall of $40 million in visible19 orders from its _________________________ ________ internal forecasts and IPO Plan. _______________________________  ____________________ 17. This risk would be heightened in the case of new-growth high-technology companies that have especially volatile prices. See, e.g., James Bohn and Stephen Choi, Fraud in the ___ ____ ____________ New-Issues Market: Empirical Evidence on Securities Class _____________________________________________________________ Actions, 144 U. Pa. L. Rev. 903, 908 (1996).  _______ 18. A "booking" represents the receipt of an order.  19. "Visibility" is a measure of the status of potential orders and the likelihood that they will be turned into revenue producing sales. -36- 36 But alleged deviations from internal forecasts, without more, do not produce a duty to disclose in the Prospectus. We recognize that investors may find information about a firm's internal projections and forecasts to be important. See Frank H. Easterbrook and Daniel R. Fischel, ___ The Economic Structure of Corporate Law 305 (1991); cf. ___________________________________________ ___ Virginia Bankshares, 501 U.S. at 1090-91 (statement of ____________________ opinion by a board of directors can be materially significant because investors know that directors usually have knowledge and expertise far exceeding that of the normal investor). Nonetheless, the federal securities laws focus on the mandatory disclosure of backward-looking hard information, not forecasts. See Easterbrook and Fischel, Corporate Law, ___ _____________ at 305-06. A firm has the option to disclose its internal projections, but is not required to do so.20 See In re ___ ______ Lyondell Petrochemical Co. Sec. Litig., 984 F.2d 1050, 1052 _______________________________________ (9th Cir. 1993); In re Convergent Technologies Sec. Litig., __________________________________________ 948 F.2d 507, 516 (9th Cir. 1991) (as amended on denial of rehearing en banc); see also Arazie, 2 F.3d at 1468; Wielgos, ___ ____ ______ _______ 892 F.2d at 516. "The federal securities laws impose no obligation upon an issuer to disclose forward-looking information such as internal projections, estimates of future  ____________________ 20. That internal forecasts are disclosed to underwriters does not make them any more susceptible to a duty to disclose to the investing public. See Lyondell, 984 F.2d at 1053. ___ ________ -37- 37 performance, forecasts, budgets, and similar data." Shaw, 82 ____ F.3d at 1209.  Plaintiffs' nondisclosure claims fail because they base their allegations solely on discrepancies between actual (but undisclosed) intra-quarterly information and Computervision's undisclosed internal projections. Cf. ___ VeriFone I, 784 F. Supp. at 1484 (in order to assert a valid __________ claim under the securities laws, plaintiffs must "establish a link between a misleading statement or implication in the prospectus and an actual fact, not a speculation about the future, omitted from the document"). The mere fact that intra-quarterly results lagged behind internal projections does not, without more, require disclosure. See In re Worlds ___ ____________ of Wonder Sec. Litig., 35 F.3d 1407, 1419 (9th Cir. 1994), ______________________ cert. denied, 116 S. Ct. 185 (1995). _____ ______ Plaintiffs try to buttress their claims by referring to SEC Regulation S-K, Item 303, 17 C.F.R.  229.303(a)(3)(ii) which requires that "known trends and uncertainties" about results of operations be disclosed in the management's discussion and analysis section of certain SEC filings. This rule, however, has to be read in light of the SEC's instruction to this paragraph which expressly states that forward-looking information need not be disclosed. 17 C.F.R. 229.303(a), Instruction 7; VeriFone ________ II, 11 F.3d at 870; Lyondell, 984 F.2d at 1053. Given this __ ________ -38- 38 context, the phrase "known trends and uncertainties" has to be understood as referring to those trends discernible from hard information alone.21 Here, unlike in Shaw, the ____ undisclosed hard information pled did not indicate a "substantial likelihood that the quarter would turn out to be an extreme departure from publicly known trends and uncertainties." 82 F.3d at 1194. Thus, the alleged nondisclosures fell neither within the ambit of 17 C.F.R. 229.303(a) or Shaw.  ____ Indeed, of the three alleged nondisclosures, the only one that plaintiffs compare to hard data is the nondisclosure as to domestic bookings. Plaintiffs assert that domestic bookings as of week seven of the third quarter of 1992 were lower than the corresponding numbers for the prior five quarters. But the Prospectus explicitly represented that Computervision suffered cyclical variations in quarterly results, with its first and third quarter results typically being lower than those of the second and fourth quarters. Given those fluctuations, the meaningful comparison of Computervision's third quarter 1992 booking numbers is to those of the third quarter of 1991. See Capri ___ _____  ____________________ 21. The SEC itself distinguishes "forward-looking information" from "presently known data which will impact upon future operating results, such as known future increases in the costs of labor or materials." Instruction 7, 17 C.F.R. 229.303(a).  -39- 39 Optics Profit Sharing v. Digital Equip. Corp., 950 F.2d 5, 10 _____________________ ____________________ (1st Cir. 1991). And that comparison is unavailing.22 As we said in Shaw, "we reject any bright-line rule ____ that an issuer engaging in a public offering is obligated to disclose interim operating results for the quarter in progress whenever it perceives the possibility that the quarter's results may disappoint the market." 82 F.3d at 1210. We further noted in Shaw that when the allegedly ____ undisclosed information (here only seven weeks into the quarter -- and where mid-quarter results were not particularly predictive23) is more remote in time and causation from the ultimate events of which it supposedly forewarns, a nondisclosure claim becomes "indistinguishable from a claim that the issuer should have divulged its internal predictions about what would come of the undisclosed information." Id. That quarterly results for the third ___ quarter of 1992 did in fact turn out to be lower than expected is not enough to produce the inference that as of the offering date Computervision had hard mid-quarter results  ____________________ 22. The relevant numbers are $2.5 million in domestic sales bookings as of week seven of the third quarter of 1992 and $3.3 million for the same period in 1991 -- a difference of $800,000, or less than 1% of the budgeted revenues for that quarter. This difference was immaterial as a matter of law. 23. Indeed, the Prospectus specifically warns that early- quarter results are not necessarily predictive because a substantial portion of both orders and shipments typically occur in the last month of the quarter. -40- 40 that would have predicted a material departure in the end-of- quarter results.24 3. Backlog _______ Plaintiffs separately allege that the Prospectus contained three material misstatements and omissions relating to backlog. One paragraph of the Prospectus is the subject of these claims: Shipments are generally made within 30 _________________________________________ days of receiving an order. In light of ___________________________ the short time between order and shipment of the Company's products, the Company ___________ generally has relatively little backlog _________________________________________ at any given date, and the Company does __________________ ____________ not believe that backlog is _________________________________________ representative of potential sales for any ______________ future period (emphasis added). Plaintiffs say that: (i) Computervision was required to, but failed to disclose the dollar amount of backlog orders; (ii) Computervision misrepresented that backlog data was not significant to its results; and (iii) the statement, "shipments are generally made within 30 days of receiving an  ____________________ 24. An issuer is not required to "disclose interim operating results for the quarter in progress whenever it perceives a possibility that the quarter's results may disappoint the market . . . . Reasonable investors understand that businesses fluctuate, and that past success is not a guarantee of more of the same. There is always some risk that the quarter in progress at the time of an investment will turn out for the issuer to be worse than anticipated." Shaw, 82 F.3d at 1210. It is only when "the issuer is in ____ possession of [hard] nonpublic information that the quarter in progress will be an extreme departure from the range of results which could be anticipated based on currently available information" that disclosure might be required under the securities laws. Id. ___ -41- 41 order," was false. "Backlog" is the dollar amount, on any given day, of orders received for which product has not yet been shipped. We address these claims in turn and find no error in the district court's rejection of them. (i) Dollar Amounts of Backlog _________________________ Item 101 of Regulation S-K requires that a prospectus disclose "to the extent material, . . . [t]he _________________________ dollar amount of backlog orders believed to be firm, as of a recent date and as of a comparable date in the preceding fiscal year."25 17 C.F.R. 229.101(c)(1)(viii) (emphasis added). Information is material when there is a reasonable likelihood that a reasonable investor would consider it important. See Shaw, 82 F.3d at 1219; Wielgos, 892 F.2d at ___ ____ _______ 517. The Prospectus disclosed that backlog levels were usually low. But, plaintiffs argue that that disclosure was not enough. They argue that the specific backlog numbers ________ were material and hence required to be disclosed. This is so, they say, because backlog entering the third quarter of 1992 was unusually low. Plaintiffs support their argument by _________ comparing the backlog entering the third quarter of 1992  ____________________ 25. Computervision issued its securities pursuant to Form S- 1. Item 11(a) of the Instructions to Form S-1 requires the prospectus to furnish the information required by Item 101 of Regulation S-K. Liability for failure to disclose the information required to be stated by Item 101 arises under Section 11 of the Securities Act. See Shaw, 82 F.3d at 1204- ___ ____ 06 (describing the statutory scheme in the context of a Form S-3 shelf offering).  -42- 42 ($26,875,000) to that entering the second quarter ($39,897,000) -- a difference of approximately $13 million or thirty-two percent. There is a threshold flaw in plaintiffs' argument. As Item 101(c)(1)(viii) itself says, the appropriate comparison is not to the numbers from an immediately preceding quarter, but to those from a comparable date in the preceding fiscal year. 17 C.F.R. 229.101(c)(1)(viii). This is particularly true here, where the Prospectus specifically stated that Computervision tended to experience seasonal declines in revenues in its first and third quarters. See Capri Optics, 950 F.2d at 10 (where ___ _____________ defendant's business was seasonal, it was not meaningful for plaintiffs to compare results for the quarter in question to those for the immediately preceding quarter). Even if quarter-to-next-quarter comparisons were appropriate, Computervision's failure to provide more specific information is nonetheless not actionable. Roughly adjusting the numbers for seasonality, they show only a minor drop in initial backlog levels (as fractions of budgeted quarterly revenues) between the second and third quarters of 1992.26 This minor drop of a few percent is not adequate  ____________________ 26. As the defendants point out, plaintiffs' numbers have meaning only if they are adjusted for seasonality. While initial backlog levels for the second and third quarters of 1992 were $39,897,000 and $26,875,000, respectively, Computervision's budgeted revenues for those quarters were -43- 43 to support the claim that the difference in backlog levels __________ between quarters was material and hence required specific backlog numbers to be disclosed. Where a variable, although material, is of only minor predictive value, disclosure of a rough estimate of that variable's value can obviate the need for more specific disclosure. Cf. Shaw, 82 F.3d at 1211 n.21 ___ ____ (disclosure of a "soft" projection may, in some cases, render the "hard" information underlying the projection immaterial as a matter of fact or of law). Indeed, disclosure of only a rough estimate may keep investors from attaching undue importance to minor shifts in the variable's value and avoids the risk of "burying the [investors] in an avalanche of trivial information." San Leandro Emergency Medical Group _____________________________________ Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 810 ___________________ __________________  ____________________ $159,500,000 and $121,000,000, respectively. When the initial backlog levels for the two quarters are looked at as fractions of the budgeted revenues for those quarters, the result is 25% for the second quarter and 22.2% for the third quarter -- a difference of less than 3%. The district court, in Computervision II, noted that the _________________ Proposed Complaint calculated initial backlog levels for the second and third quarters of 1992 as a percentage of actual ______ revenues (for the second quarter) and forecasted revenues ________ ___________________ (for the third quarter), respectively, and found a 9% difference between the two percentages. 914 F. Supp. at 721. The district court ruled that this 9% differential was an insufficient basis to support plaintiffs' claim. Id. Not ___ knowing the degree to which Computervision's forecasts may have been systematically biased vis-a-vis actual results, and not having been provided with this information by the parties, we are reluctant to endorse the plaintiffs' 9% number. Cf. Wielgos, 892 F.2d at 515 (defendant's cost ___ _______ estimates were systematically biased). Nevertheless, we note that our conclusion would not be different whether we used 3% or 9%.  -44- 44 (2d Cir. 1996) (quoting TSC Industries, Inc. v. Northway, _____________________ _________ Inc., 426 U.S. 438, 448 (1976)); Convergent, 948 F.2d at 516 ____ __________ (same). In sum, plaintiffs have no claim that Computervision's general statement that backlog was usually low, without the disclosure of specific numbers, was materially misleading as of the effective date of the offering. Cf. Backman v. Polaroid Corp., 910 F.2d 10, 16 ___ _______ ______________ (1st Cir. 1990) (en banc) ("Disclosing that Polavision was being sold below cost was not [materially] misleading by reason of not saying how much below."); Worlds of Wonder, 35 ________________ F.3d at 1419. (ii) Immateriality of Backlog ________________________ Plaintiffs argue that the Prospectus, in stating that "the Company does not believe that backlog is representative of potential sales for any future period," in effect falsely suggested that backlog was not significant to Computervision's results. Plaintiffs misread the Prospectus. The statement in the Prospectus does not say that information on backlog is insignificant or immaterial. Instead, it says that such information should not be taken as representative. The statement cautions investors that they should not take backlog levels as necessarily predicting results for future periods. In addition, there is at least one other statement on the very same page of the Prospectus -45- 45 that warns investors that data available early in a quarter (i.e., opening backlog) is not necessarily a strong predictor ____ of quarterly results because: a substantial portion of the Company's orders and shipments typically occur in the last month of each quarter. Therefore . . . unexpected delays or actions . . . could result in significant quarterly fluctuations in the Company's operating results. Hence, when read in context, Computervision's statement that backlog was not representative of sales was plainly a warning that investors should not draw too many conclusions from backlog figures, and not a statement that backlog itself was immaterial or insignificant. (iii) Shipments Within Thirty Days ____________________________ Plaintiffs' final argument on backlog is that the district court erred in concluding that the statement "shipments are generally made within thirty days of receiving an order" was not materially false or misleading. Plaintiffs point to a backlog aging analysis from the seventh week of the third quarter of 1992, which indicates that 39% of the backlog balance, at that time, was to be shipped in more than thirty days. The first problem with the argument is that, although plaintiffs attack the word "generally," they base their claim solely on data from one portion of one quarter and fail to allege anything meaningful about Computervision's general practice. Second, even if one portion of one quarter -46- 46 could be taken as representative, plaintiffs' factual allegations would not support a misrepresentation claim. Plaintiffs allege that approximately sixty-one percent of orders were shipped out in less than thirty days, six percent were shipped in between thirty and sixty days, and thirty- three percent were shipped in more than sixty days. Computervision's statement said that shipments were generally made within thirty days of receiving an order, not that they were always made within thirty days. That sixty-one percent of orders in one portion of one quarter were shipped within thirty days is perfectly consistent with the statement that orders were generally shipped within thirty days. There was no material misrepresentation. 4. CADDS 5 _______ Plaintiffs' final allegations focus on statements concerning CADDS 5, Computervision's then-newest CAD/CAM software product and the centerpiece of the firm's new business strategy. Plaintiffs allege that the Prospectus made two sets of material misstatements or omissions with respect to CADDS 5: (i) the Prospectus misrepresented that, as of June 1992, CADDS 5 was a "successful product," being shipped in "volume," i.e., to thousands of customers; and ____ (ii) the Prospectus materially overstated CADDS 5's potential for success when, in fact, the product was beset with -47- 47 problems. As with the backlog claims, we affirm the district court's rejection of the CADDS 5 claims. (i) Successful Product Shipping in Volume _____________________________________ Plaintiffs' Proposed Complaint alleged that the "Prospectus[] misrepresented CADDS 5 as a successful product commercially shipping in volume." The Proposed Complaint then defined "`[v]olume commercial shipments'" as those "involving several thousand customers." The language in the Prospectus, however, neither refers to CADDS 5 as a "successful product shipping in volume," nor to shipments to "several thousand customers;" those descriptions are wholly the plaintiffs' own. The plain language of the Prospectus speaks for itself: Beta testing of CADDS 5 (release 2.0) commenced in March 1992 with 24 of the _______ Company's largest CADDS customers and _________ early introduction sales commenced in April 1992. Commercial shipments of CADDS 5 (release 2.0) began in June 1992 and as of June 28, 1992, Release 2.0 had _____________________________________ been shipped to 32 customers (emphasis _______________________________ added). Far from alluding to thousands of customers, the Prospectus specified the number of customers to whom the product had _________ been shipped -- 24 in the beta testing stage and 32 in the commercial shipping stage. Plaintiffs' assertion that this precise statement can be interpreted as implying that CADDS 5 was being shipped, or was ready to be shipped, to thousands, is baseless. -48- 48 Further, the Prospectus was replete with language cautioning investors that the market in general (i.e., a ____ large volume of customers) had not accepted CADDS 5 as yet and that the product might need further enhancements. For example, the Prospectus stated that although Computervision hoped to replace its "declining hardware revenues and margins with sales of higher margin CAD/CAM software products . . . [n]o assurance can be given that the Company will be _____________________________________________________________ successful in achieving this objective" (emphasis added). In ______________________________________ addition, the Prospectus warned that "customer acceptance of _______________________ CADDS 5 is critical" to continued customer purchase of ______________________ Computervision's existing software product, CADDS 4X, that the "delayed release of CADDS 5 (Release 2.0) resulted in _______________________________________________________ customers delaying product purchases" and that: ____________________________________ the CAD/CAM industry is characterized by rapidly changing technology and frequent ________ new product introductions and product _________________________________________ enhancements . . . [and] [t]here can be ____________ _______________ no assurance that the Company will _____________ continue to be successful in identifying, developing and marketing new products or enhancing its existing products . . . [or] that new customers will change to ___________________________________ the Company's new products even if they _________________________________________ are judged to be superior (emphasis ______________________________ added).  Computervision's statement that it had commercially shipped CADDS 5 software to 32 customers must be viewed in the context of the Prospectus' numerous cautionary statements that CADDS 5 might never be accepted by the market. See ___ -49- 49 Shaw, 82 F.3d at 1213 (if a statement is couched in ____ cautionary language that disclaims the drawing of a particular inference, a claim that the statement was materially misleading may fail as a matter of law). The context confirms that any possible misleading inference that might be drawn from Computervision's statement is properly deemed immaterial as a matter of law. (ii) Misleading Optimistic Statements ________________________________ Plaintiffs' final claim is that certain optimistic statements in the Prospectus regarding the development and commercial prospects of CADDS 5 were materially misleading in light of Computervision's alleged nondisclosure of problems the product was facing. See, e.g., Hanon v. Dataproducts ___ ____ _____ ____________ Corp., 976 F.2d 497, 502 (9th Cir. 1992). _____ A duty to disclose technical or developmental problems with a product may arise where a company makes strongly optimistic or concrete statements about that product that are in stark contrast to its internal reports. Cf. ___ Serabian, 24 F.3d at 363-65 (sustaining Section 10(b) claims ________ where there was a "contrast between what company officials were hearing internally . . . and what the company was telling the public at the same time" (emphasis in original)). ________________ But, in this case, the statements about CADDS 5 in the Prospectus were not so optimistic as to be materially misleading about the existence of developmental or commercial -50- 50 difficulties with CADDS 5. To the contrary, the Prospectus frequently alludes to the uncertainties associated with the release of a new product. The key statements identified by the plaintiffs are that Computervision expected CADDS 5 "to broaden the number of customers in existing accounts as well as attract new customers," and that "Computervision believes that CADDS 4X and CADDS 5 are likely to be used in tandem by major accounts in the foreseeable future." These statements, whether read in isolation or in the context of Computervision's numerous warnings that CADDS 5 might not be accepted by the market and might need further enhancements,27 suggest, at most, the hope that CADDS 5 will eventually gain acceptance in the market. Such a hope is not unusual for a company releasing a new product. Cf. ___ VeriFone I, 784 F. Supp. at 1484 ("securities laws presume __________ that skilled investors are aware that a corporation's performance with a new product . . . is unlikely to replicate past successes"). Computervision's statements did not rise to the level of optimism or certainty that would make them materially misleading in the absence of disclosure of initial developmental problems the product was facing. Cf. Shaw, 82 ___ ____  ____________________ 27. The Prospectus also states that "a significant delay" in the availability of CADDS 5 would adversely affect Computervision and that many of Computervision's competitors "have greater financial and operating resources" and that "there can be no assurance that competitors will not produce equivalent or superior products."  -51- 51 F.3d at 1219 n.33 (cautiously optimistic statements, expressing at most a hope for a positive future, do not trigger a duty to update); San Leandro, 75 F.3d at 811 ____________ (subdued generally optimistic statements constituted nothing more than puffery and were not actionable); In re Time Warner _________________ Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993) (statements _________________ at issue lacked "definite positive projections" of the sort that would require later correction), cert. denied, 114 S. _____ ______ Ct. 1397 (1994). Further, the statements here are markedly less enthusiastic than the statements that other courts have found actionable. See In re Apple Computer Sec. Litig., 886 ___ ________________________________ F.2d 1109, 1118-19 (9th Cir. 1989) (company executives stated that new computer product would be "phenomenally successful the first year out of the chute" and would make company's "growth before this look small"), cert. denied, 496 U.S. 943 _____ ______ (1990); Hanon, 976 F.2d at 501-02 (company's press release _____ stated that new product had received "strong interest and high acclaim from users and analysts alike" and its special features were "rapidly making [it] . . . one of the most popular in [the company's] line"). Computervision's mild statements of hope, couched in strongly cautionary language, cannot be said to have become materially misleading. IV. Conclusion __________ The decision of the district court is affirmed.  ________ -52- 52