**Robert FREEDMAN, et al., Plaintiffs**

**v.**

**VALUE HEALTH, INC., et al., Defendants.**

No. CIV.A. 3–95CV2038, CIV.A. 3–97CV2711.

United States District Court, D. Connecticut.

March 20, 2001.

RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 206, 211] AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 213]

HALL, District Judge.

This case is a consolidated class action securities fraud case arising out of the merger of Diagnostek, Inc. ("Diagnostek") and Value Health, Inc. ("Value Health"). The plaintiffs allege that corporate and individual defendants made a series of false and misleading statements about the two companies and their impending merg-

er, and that the defendants failed to disclose material information in the registration statement filed in connection with the merger. The actions were brought pursuant to the federal securities laws, the state laws of New Mexico, and the common law.

The defendants now move for summary judgment on all claims and the plaintiffs move for summary judgment on the Section 11 and Section 12(2) claims. For the reasons discussed below, the defendants' motions for summary judgment are granted and the plaintiffs' motion for summary judgment is denied.

## I. FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted.

### A. Parties

The merger between Diagnostek and Value Health resulted in the filing of two separate actions alleging similar claims. The first action, *Freedman v. Value Health, et al.*, No. 3:95–CV–2038, was filed in the District of Connecticut [hereinafter *Freedman* action]. The other original action, *Bash v. Value Health, Inc.*, No. 3:97–CV–2711 [hereinafter *Bash* action] was filed in the District of New Mexico. The *Bash* action was subsequently transferred to the District of Connecticut and consolidated with the *Freedman* action.

On February 18, 1999, the court granted the motions for class certification in both the *Freedman* and *Bash* actions.[1] One class covers all persons and entities who purchased or otherwise acquired the common stock of Value Health, Inc. during the period of April 3, 1995 through and including November 7, 1995, including those persons or entities who acquired shares of Value Health common stock pursuant to or

traceable to the Form S–4 registration statement, in exchange for their shares of Diagnostek, Inc. The second class covers all persons and entities who purchased or acquired Diagnostek common stock during the period of between April 3, 1995 through and including July 28, 1995.

The complaints in the two actions were filed against two groups of defendants. First, the plaintiffs sued Value Health, its subsidiary Diagnostek, and nine former Value Health directors and officers ("Value Health defendants"). Second, the plaintiffs sued Nunzio DeSantis, Courtlandt Miller, and William Barron who were, respectively, the former Chairman and Chief Executive Officer ("CEO"), General Counsel and Secretary, and President, Chief Financial Officer ("CFO"), and Chief Operations Officer ("COO") of Diagnostek ("Diagnostek Officer defendants"). The defendants filed various motions to dismiss, which the court granted in part and denied in part. *See Freedman v. Value Health*, 958 F.Supp. 745 (D.Conn.1997) [hereinafter *Freedman I*]; Ruling on Motion to Dismiss and on Motion for Leave to Amend Complaint, Feb. 19, 1999 [Dkt. No. 158] [hereinafter *Freedman II*]; *Freedman v. Value Health*, 2000 WL 630916 (D.Conn. Mar.24, 2000) [hereinafter *Freedman III*].

The following claims remain in this action: 1) claims brought by the Freedman plaintiffs and the Bash plaintiffs against Value Health, Diagnostek, the individual Value Health officers and directors, and Nunzio DeSantis under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933; 2) claims brought by the Bash plaintiffs against Value Health and the Value Health individual officers and directors and by the Freedman plaintiffs against Value Health, the Value Health individual

---

1. The court amended its ruling on April 1, 1999. The court denied the motion to modify the class period on July 20, 2000 [Dkt. No. 204].

officers and directors, and DeSantis under Sections 10(b) and 20 of the Securities Exchange Act of 1934; 3) claims brought by the Bash plaintiffs against all defendants under Section 14(a) of the Securities Exchange Act of 1934; 4) claims brought by individual (not class) Bash plaintiffs against all defendants under common law doctrines of fraud and negligent misrepresentation; 5) claims brought by the Bash plaintiffs against Value Health and the individual Value Health officers and directors under the New Mexico Securities Act §§ 58–13B–30, 58–13B–31, 58–13B–32, and 58–13B–40. The defendants seek summary judgment on all claims. The plaintiffs seek summary judgment on the Section 11, 12(a)(2) and 15 claims.

### B. Merger

Value Health provides a variety of managed care services to health care providers and payers, specializing in mental health, pharmaceuticals, and utilization control software. At the time of the merger, Value Health was a leading provider of health care services, with 1994 revenues of $976.4 million.

Prior to its merger with Value Health, Diagnostek was in the business of institutional pharmacy management and mail-order pharmaceuticals. It provided, among other things, mail order prescription drug benefit management services for numerous employer medical plans across the country. According to Diagnostek, its core business was integrated pharmacy services. Integrated pharmacy services consisted of numerous contracts, some which were fee-for-services contracts and some which were capitated or fixed fee contracts.

In January 1995, Value Health and Diagnostek began to discuss the possibility of a business combination. Following initial discussions, the parties exchanged information and began negotiating the terms of a merger. Among the information exchanged was information about Diagnostek's new, three-year contract to provide prescription drug services under a contract with the State of New Jersey (the "New Jersey Contract"). Value Health also received information about the status of additional smaller Diagnostek contracts. Value Health reviewed and discussed with Diagnostek various projections and revised projections for the anticipated performance of its overall business over the remainder of 1995. Both parties agreed that, during the due diligence process, any Requests for Proposals that the companies were bidding on at the time would not be disclosed because the companies were bidding against each other on many of them. The due diligence did include a review of the processes for preparing bids and the products offered in those bids, but not the prices.

On March 20 and 21, 1995, representatives from both companies met to discuss Diagnostek's projections for the remainder of 1995 and, specifically, for the quarter ending March 31, 1995, the final quarter of Diagnostek's 1995 fiscal year. On March 27, 1995, after further negotiations, Value Health and Diagnostek executed a definitive merger agreement. The agreement provided that, subject to approval by the shareholders of both companies, Diagnostek would be acquired by Value Health and Diagnostek's shareholders would exchange their Diagnostek shares for Value Health stock at an "exchange ratio" of 0.55 Value Health shares for one share of Diagnostek stock. The same day, Value Health and Diagnostek issued a joint press release announcing their intended merger, pursuant to which Diagnostek was to be merged with and into Value Health, with Value Health remaining as the surviving corporation.

## C. Diagnostek's New Jersey Contract

Under the New Jersey Contract, Diagnostek provided prescription drugs to eighteen state facilities. on a 24–hour basis. The New Jersey Contract was a capitated contract in which Diagnostek agreed to provide services for a fixed amount rather than on a fee-for-service basis. The contract had a three-year term with performance beginning on February 1, 1995. According to Diagnostek, the New Jersey Contract was not a part of Diagnostek's core integrated pharmacy services business.

Diagnostek's fiscal year closed on March 31, 1995. According to the Registration Statement and Joint Proxy Statement—Prospectus ("Prospectus"), on May 16, 1995, Diagnostek advised Value Health that its actual financial results for the fourth quarter and fiscal year would be lower than the projections previously discussed with Value Health due to serious problems with the performance of the New Jersey Contract. Plaintiffs' Compendium of Exhibits in Support of Motion for Partial Summary Judgment [Dkt. No. 216] at Ex. 3 [hereinafter Pls. Ex.]. Unanticipated startup costs and losses had to date cost Diagnostek $3 million. In anticipation of future losses, Diagnostek also recorded a loss reserve of approximately $9.6 million in its March 31, 1995 quarterly results.

On May 25, 1995, Mark Schorr, an attorney for Diagnostek, wrote to the State of New Jersey's representative with regard to the contract. Schorr wrote that Diagnostek's subsidiary had made "a substantial error in preparing its bid for the contract" and submitted "a bid more than $4 million too low on an annualized basis." Pls. Ex. 34, at 1–2. The letter was sent to the State in an attempt to renegotiate the contract and further stated that the losses sustained on the contract were "so substantial that it would be unconscionable to

enforce it further." *Id.* In the letter, Schorr anticipated that the loss would be more than $15 million for the initial three years of the contract. *Id.* Prior to the merger, Diagnostek gave this letter as well as all documentation related to the New Jersey Contract to Value Health.

According to Diagnostek, on June 7, 1995, Schorr sent a second letter to the State of New Jersey enclosing loss projections for the three years of the New Jersey Contract. That schedule showed a loss reserve of $9,620,900.00 over the life of the New Jersey Contract. The letter also included a June 5, 1995 Independent Auditor's Report of KPMG Peat Marwick LLP for Diagnostek's financial statements. That financial statement reported the loss reserve for the New Jersey Contract as $9,621,000.00, representing the accrual for the losses estimated to be incurred going forward over the term of the New Jersey Contract.

Based on the New Jersey Contract loss projections, Value Health and Diagnostek renegotiated the merger price. The merger agreement was renegotiated from an exchange ratio of 0.55 Value Health shares for one share of Diagnostek stock to an exchange ratio of 0.4975 shares of Value Health stock for one share of Diagnostek stock. On June 4, 1995, the merger agreement was amended to reflect the new exchange ratio.

On July 27, 1995, Andrew Masetti, Executive Vice President and CFO of Diagnostek, wrote a letter to Barry Smith, Chief Executive Officer at Value Health. In that letter, Masetti stated that "the $9.6 MM is achievable only if ... actions are taken immediately." Appendices of Exhibits of Moving Defendants, Nunzio P. DeSantis, Courtlandt G. Miller and William Barron, in Support of Motion for Summary Judgment [Dkt. No. 222] at Ex. 7 [hereinafter DeSantis Ex.]. On August

11, 1995, Masetti wrote a letter to Value Health's chairman, Robert Patricelli, concerned because he had not received a response from Smith. In the letter to Patricelli, Masetti stated that "[i]f the ValueRx leadership team does not immediately address the issues facing [the New Jersey] project, the $9.6 MM loss contract reserve we established at March 31, 1995 will in no way be adequate to cover ongoing losses, necessitating a significant increase in this reserve." DeSantis Ex. 8. By the end of 1995, Value Health took a total reserve of $16 million on the New Jersey Contract and thereafter transferred the contract to another provider.

### D. Other Diagnostek Contracts

In addition to the losses sustained on the New Jersey Contract, the plaintiffs claim that Diagnostek sustained losses on other contracts during 1995, which losses should have been disclosed. The defendants argue that, of five capitated contracts other than New Jersey, three were in loss positions in the months immediately preceding the merger. In April 1995, Diagnostek lost $45,823.47 on its New Mexico Retirees Healthcare Authority contract, $15,568.13 on its Borg–Warner contract, and $23,210.80 on its Neighborhood Health Partnership contract. However, because it earned $34,475.61 on the Boise Cascade contract and $105,284.56 on the Queens Hawaii contract in the same month, Diagnostek made an overall profit of $55,157.77 on the five capitated contracts. Similarly, in May 1995, Diagnostek lost $170,385.95 on the New Mexico Retirees Healthcare Authority contract, $37,442.36 on the Borg–Warner contract, and $34,106.59 on the Neighborhood Health Partnership. Despite these losses,

however, Diagnostek made an overall profit of $13,555.66 on the five capitated contracts during May 1995 because it earned a profit of $52,825.56 on its Boise Cascade contract and a profit of $202,665.00 on its Queens Hawaii contract.

According to William Barron, then COO of Diagnostek, because the contracts were relatively new, Diagnostek had not had much experience with them. David Wurzer, Value Health's CFO, testified that "[t]he passage of time is the only way you can evaluate capitated contracts and their ultimate profitability" as they "ebb and flow in their profitability from month to month." DeSantis Ex. 19, at 90–91. Patricelli similarly testified that the losses ultimately incurred could not be ascertained prior to June 30, 1995 due to "[r]apid changes in utilization patterns in capitated contracts . . . ." DeSantis Ex. 18, at 73–74.

### E. Value Health's Ford Contract

Since at least 1985, ValueRx, one of four principal subsidiaries of Value Health, provided pharmacy benefit management services to Ford under a capitated contract (the "Ford Contract"). Because Ford was the largest of all ValueRx clients, the Ford Contract was an important contract to Value Health. ValueRx lost money on the contract in 1994. In light of the loss, Value Health renegotiated and won a rebid for the Ford Contract at a rate increase of 19% in January 1995.

In April 1995, ValueRx prepared projections of anticipated profitability on the Ford Contract through the end of 1995 on both a gross margin and net margin basis.[2] The forecast projected a gross margin loss of $471,000.00 and a net margin loss of $4.3 million for the year. The April forecast

---

**2.** Value Health defined gross margin as profit or loss before allocation of general and administrative expenses and net margin as prof-

it or loss after allocating general and administrative expenses according to a prescribed formula.

excluded the anticipated benefits of various savings programs not yet implemented at the date the forecasts were prepared. The anticipated savings for programs that were not yet implemented included $3.0 million total for four initiatives, and another either $3.2 million or $1.4 million from resolution of enrollment issues. Taking the savings programs into consideration, Value Health was projecting a profit on a gross margin basis of $3.9 and $5.7 million, and a profit on a net margin basis of between $0.1 and $1.9 million for 1995.

Value Health's auditors, Coopers & Lybrand, projected a $1.5 to $2.0 million savings in "best case" savings programs and $1.4 to $2.8 million savings for resolution of the enrollment issue plus $147,000.00 for underpaid premiums. Starting with the $4.3 projected net loss, as of March 31, 1995, Coopers was thus projecting a net margin ranging from a $1.3 million loss to a $650,000.00 gain.

### F. 1994 Annual Report

On or about April 3, 1995, Value Health issued its 1994 Annual Report. The report was accompanied by a letter from Value Health's chairman, Robert Patricelli, which contained a statement addressing its Ford Contract. In the letter, Patricelli made the following statements:

> Our new rate under the Ford contract at Value Rx proved to involve a loss, but the good news on that front was that we were able to absorb the unplanned loss through over-plan results elsewhere and still meet investor expectations. Moreover, in January 1995 we won a rebid for Ford at a significant rate increase which will restore that important contract to profitability.

Appendix of Exhibits in Support of the Value Health Defendants' Motion for Summary Judgment [Dkt. No. 209] at Ex. 8 [hereinafter "VH Ex."].

Portions of the 1994 Annual Report were incorporated by reference into the Prospectus because Value Health's Form 10–K was incorporated into the Prospectus and the Form 10–K had incorporated portions of the 1994 Annual Report. However, the entire report was not incorporated: only portions of it were incorporated into the Form 10–K. VH Ex. 26; Pl.Ex. 3, at 3. Patricelli's letter was not specifically referred to in the Form 10–K.

### G. Press Release

On June 5, 1995, Diagnostek announced its results for the quarter and fiscal year ended March 31, 1995. On the same date, Value Health and Diagnostek issued a joint press release (the "June 5 Press Release"). The press release disclosed that Diagnostek was taking accounting charges totaling $12.6 million to cover unanticipated start-up costs and estimated future losses on the New Jersey Contract. The press release further announced that, due to the losses incurred on Diagnostek's New Jersey Contract, the merger agreement had been renegotiated at a new exchange ratio of 0.4975 shares of Value Health stock in exchange for each share of Diagnostek stock.

In the June 5 Press Release, Value Health's chairman, Robert Patricelli, made the following statement:

> The renegotiated exchange ratio takes into account a full review of the on-going earnings potential of Diagnostek, and we remain convinced that the transaction will be very positive for Value Health. We do not regard the problem with the New Jersey contract to involve any impairment of Diagnostek's core business and we remain committed to the merger.

VH Ex. 13. In his statement, Diangostek's chairman, Nunzio DeSantis, said:

Diagnostek's core integrated pharmacy service revenues grew by 65 percent in the just reported fiscal year, so this is a thriving business which should be strengthened even further in the merger with Value Health.

*Id.* The press release further stated that Diagnostek enjoyed revenue growth of 65% in Diagnostek's core business over the recently-ended fiscal year before the press release. At the time of the press release, Diagnostek had enjoyed nine consecutive quarters of increased earnings and net revenues. Barron, DeSantis and Masetti all gave deposition testimony that they believed Diagnostek was a thriving business at the time of the June 5, 1995 press release.

### H. Proxy Statement/Prospectus

On June 27, 1995, Value Health and Diagnostek jointly issued the Prospectus.[3] The Prospectus described the merger and solicited shareholder approval. It was mailed to the shareholders of each company. The mailing to the Diagnostek shareholders was accompanied by a cover letter of DeSantis dated June 27, 1995, recommending approval of the merger as in the best interests of Diagnostek and its shareholders. The mailing to the Value Health shareholders was accompanied by a cover letter from Value Health's CEO, Robert Patricelli, dated June 27, 1995, recommending approval of the merger as fair and in the best interests of Value Health and its shareholders.

As of the effective date, the last available Diagnostek and Value Health quarterly financial results were for the period ended March 31, 1995. These financials were included in the Prospectus through summary material and by incorporating Diagnostek's Form 10–K for the quarter and year ended March 31, 1995 and Value Health's Form 10–Q for the quarter ending on that same date.

The Prospectus expressly disclosed the fact that Diagnostek had taken a reserve for anticipated losses on the New Jersey Contract and explicitly disclosed the risks associated with these types of contracts (the "Risk Disclosure").

> Under certain of its specialty benefit plan contracts, Value Health agrees to arrange and pay for providing mental health and prescription drug services to plan beneficiaries for a fixed amount regardless of the cost to Value Health of providing such services. . . . In certain circumstances, Diagnostek has similar arrangements with respect to its prescription drug services. Value Health and Diagnostek use various mechanisms to predict and reduce their financial risks under such agreements. There can be no assurance, however, that, in the future, increases in health care costs or higher than anticipated utilization rates, significant aspects of which are outside the control of Value Health and Diagnostek, will not cause expenses associated with such agreements to exceed revenues or projected targets and have a material adverse effect on the results of operations or financial condition of Value Health or Diagnostek.

Pls. Ex. 3, at 14.

The Prospectus contained a statement by the Diagnostek board, recommending

---

**3.** The parties dispute when the Registration Statement and Prospectus became effective. The plaintiffs assert that the Registration Statement and Prospectus became effective on July 28, 1995. The merger transaction was consummated on July 28, 1995, but that is not the relevant date for purposes of §§ 11 and 12(a)(2) claims. The defendants argue, and the court agrees, that the Registration Statement, which contains the Prospectus, became effective on June 27, 1995 at 5:30 p.m. *See* Order Declaring the Registration Statement Effective, VH Ex. 37.

the merger to its shareholders. The Prospectus also contained a recommendation by the board of Value Health, recommending to its shareholders that the proposed merger be approved (the "Fairness Recommendation"). Based on specific factors enunciated in detail in the Prospectus, including a formal fairness opinion provided by Montgomery Securities, Value Health's financial advisor, Value Health's board expressed its unanimous belief "that the Merger is fair to, and in the best interests of, Value Health and its stockholders." Pls. Ex. 3, at 25.

The Prospectus sets out eleven specific factors that the board considered in reaching its recommendation. These factors included:

 . . . . .

(i) its knowledge of the business, operations, properties, assets, financial condition, operating results and prospects of Value Health and Diagnostek;

(ii) current industry, economic and market conditions;

(iii) presentations by Value Health's management and by Montgomery, Value Health's financial advisor, with respect to Diagnostek and Value Health;

(iv) the opinion of Montgomery as to the fairness, from a financial point of view, of the consideration to be paid by Value Health pursuant to the merger . . .;

(v) the terms of the Merger Agreement, which were the product of arms' length negotiations . . .;

(vi) the structure and accounting treatment of the transaction; and

(vii) the opportunity for Value Health stockholders to have an ownership interest in the largest independent pharmacy benefit manager.

The [Board] also considered such negative factors as

(i) the existing Diagnostek litigation;

(ii) the effect of the termination of the CIGNA contracts on Diagnostek;

(iii) Diagnostek's lower than expected results of operations for the fiscal quarter ended March 31, 1995; and

(iv) the New Jersey Contract.

Pls. Ex. 3, at 25. The Prospectus also indicated that Montgomery Securities, an investment bank, had conducted its own analysis and rendered a formal opinion that the amount paid by Value Health in the transaction was "fair to [Value Health] from a financial point of view." Pls. Ex. 3, at 25. In addition, at the time the Prospectus was issued, the included Diagnostek's financial statements had been recently audited by KPMG Peat Marwick.

## I. After the Merger

On July 28, 1995, the shareholders of Value Health and the shareholders of Diagnostek approved the merger. The merger was consummated later the same day. As agreed, the senior management and directors of Diagnostek resigned shortly thereafter while Value Health management remained in place to operate the combined company. Pursuant to the merger, Value Health issued approximately 12.2 million shares of its common stock to former Diagnostek shareholders at the modified 0.4975 ratio. Value Health shareholders did not buy any stock in connection with the merger. At the then-current market price of $35.125 per share for Value Health stock, the merger was valued at approximately $430 million.

On August 1, 1995, Diagnostek's and Value Health's June 1995 quarter results were announced. On or about August 14, 1995, Diagnostek's Form 10–Q for the quarter was filed with the Securities Exchange Commission ("SEC"). According to the SEC filings, the results for the quarter ended June 30, 1995 indicated that

Diagnostek had revenues of $182.9 million and earned a pretax operating profit of $8.4 million or $0.21 per share. The SEC filings also indicate that, in the previous quarter ended March 31, 1995, Diagnostek had revenues of $177.2 million and experienced a pretax operating loss of $4.2 million. In the previous calendar year, Diagnostek averaged revenues of $165.1 million per quarter and a pretax operating profits of $4.25 million per quarter. In its June 1994 quarter, Diagnostek had revenues of $166.5 million and a pretax operating profit of $6.6 million.

On August 11, 1995, Value Health filed its Form 10–Q with the SEC for the quarter ended June 30, 1995. The SEC filings indicate that during that quarter, Value Health had revenues of $281.6 million, and pretax earnings of $29.2 million. These results were higher than the prior quarter revenues of $276.1 million and pretax operating earnings of $27.6 million. In 1994, Value Health averaged $244.1 million in revenues per quarter and $20.6 million in pretax operating earnings per quarter. In its June 1994 quarter Value Health had revenues of $243.2 million and pretax earnings of $20.4 million.

Announcement of the June 1995 quarterly results for Diagnostek and Value Health did not appear to have "surprised" the market. After the results were announced, the closing stock price of Value Health did not fluctuate substantially. In mid-July of 1995 the stock price was $34.88 and in mid-August it was $35.38.

Diagnostek became a subsidiary of ValueRx, one of four principal operating subsidiaries of Value Health. On September 14, 1995, David Wurzer, Value Health's chief financial officer, received from ValueRx a "flash report" providing preliminary Diagnostek financial results for the months of July and August 1995, showing disappointing earnings. Results for the Ford Contract also indicated that contract would not be profitable.

On September 20, 1995, Patricelli appeared at a previously scheduled conference sponsored by Montgomery Securities. At the conference and in a follow-up conference call with analysts the next day, Patricelli reported that the initial reports received on Diagnostek's post-merger performance reflected "softness in [Diagnostek's] results at this point" and "uncertainties surrounding Diagnostek's results going forward." VH Ex. 22. He informed the investment community that, in part as a result, Value Health expected "non-merger related" expenses during the third and fourth quarters of 1995 to "clean up" the Diagnostek business. *Id.* He also stated that Value Health had separately determined to take additional reserves in connection with new cost-cutting measures in other parts of its business where "expense structures were simply too fat." *Id.*

Following these announcements, Value Health's stock dropped significantly, from approximately $37.00 per share on September 19 to $26.25 per share on September 25. This was a decline of approximately $8.875 or 25.27% per share from the market price at the time of the merger. During the following weeks, Value Health worked with its accountants to determine the amount of charges that needed to be taken in connection with Diagnostek's business, as well as the charges that needed to be taken with respect to the Ford Contract.

In the third quarter, $34 million in reserves was taken on the Diagnostek and Value Health contracts. Approximately $19.1 million was associated with anticipated losses over the remaining life of the Ford Contract. Approximately $1.3 million related to a Value Health contract with SelectCare.

Value Health announced its third quarter 1995 results on November 7, 1995, including the loss attributable to Ford. In addition, Patricelli reported the total level of charges that Value Health anticipated taking in both its third and fourth quarter financial statements. Following this report, Value Health's stock dropped from approximately $25.50 per share on November 6 to approximately $23.00 per share on November 7.

In his letter to shareholders in the Value Health 1995 Annual Report, Patricelli admitted that Diagnostek was "a bad acquisition—or, more accurately, right acquisition, wrong price.... [W]e didn't spot all the problems—we blew it." Pl.Ex. 14. He indicated that Value Health had "made organizational and management changes so such acquisition oversights [wouldn't] happen again." *Id.*

## II. THE CLAIMS

The claims that remain in the action are based on alleged misrepresentations and omissions made by the defendants that the plaintiffs argue violated Sections 11, 12(a)(2), 15, and 14(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)–5 promulgated thereunder, the relevant control person provisions in the 1933 and 1934 Acts, New Mexico Securities Law, and common law.

First, the plaintiffs claim that the Prospectus contained material omissions about the financial status of both Diagnostek and Value Health that were either required to be in the Prospectus or were necessary to make other statements in the Prospectus not misleading. Second, the plaintiffs claim that the same material omissions

were used to solicit proxies from Diagnostek shareholders. Third, the plaintiffs claim that the statements made by Patricelli in Value Health's 1994 annual report and two statements made in a joint press release on June 5, 1995 were false and misleading to investors about the financial status of the two companies.[4]

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is only appropriate when there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 639 (2d Cir.2000) (citing *Fagan v. New York State Elec. & Gas Corp.*, 186 F.3d 127, 132 (2d Cir.1999)). The burden of showing that no genuine factual dispute exists rests upon the moving party. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000) (citing *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994)). Once the moving party establishes that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to "set forth specific facts showing that there is genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In assessing the record to determine if such issues do exist, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Heilweil v. Mount Sinai Hosp.*, 32

4. The court notes that the parties stipulated to dismissal of the insider trading claim against DeSantis prior to this ruling and the court granted the Motion for Order on Stipulation to Dismiss Insider Trading Claim [Dkt. No. 210–1] during oral argument on February 28, 2001.

F.3d 718, 721 (2d Cir.1994). "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton,* 202 F.3d at 134. When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. *See Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000).

### B. Defendants' Motions for Summary Judgment

#### 1. Sections 11, 12(a)(2), and 15 of the Securities Act of 1933

The plaintiffs assert claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, alleging that the Registration Statement and Prospectus filed in connection with the Value Health and Diagnostek merger contained materially false statements and omitted material information required to be provided. Sections 11 and 12(a)(2) are enforcement mechanisms for the mandatory disclosure requirements of the Securities Act of 1933. Section 11 imposes liability on signers of a registration statement. It also imposes liability on underwriters, if the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. Section 12(a)(2) provides that any person who "offers or sells" a security by means of a prospectus or oral communication containing a materially false statement or that "omits to state a material fact necessary to make the statements, in the light of the circumstances under which they were made, not misleading," shall be liable to any "person purchasing such security from him." 15 U.S.C. § 77*l*(a)(2).[5] Section 15 imposes liability upon "[e]very person who ... controls any person liable under section 11 or 12 ... to the same extent as such controlled person...." unless "the alleged controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlling person alleged to exist." 15 U.S.C. § 77*o*.

Taken together, these sections subject defendants to liability if, at the time of its effective date, the Prospectus: 1) contained an untrue statement of material fact; 2) omitted to state a material fact required to be stated therein; or 3) omitted to state a material fact necessary to make the statements therein not misleading. 15 U.S.C. § 77k. The plaintiffs allege that the defendants are liable under the second and third prongs because the Prospectus omitted material facts about the financial conditions of Value Health and Diagnostek. The plaintiffs argue that such omissions were required in the Prospectus and were necessary to make the fairness recommendation and the risk disclosure statement not misleading.

In order to prevail on a claim under §§ 11 and 12(a)(2), a plaintiff "need only demonstrate that the registration statement or prospectus was materially false and misleading without proving scienter." *Elfenbein v. American Financial Corp.,* 487 F.Supp. 619, 626 (S.D.N.Y.1980) (citing *Franklin Savings Bank v. Levy,* 551 F.2d 521, 526–27 (2d Cir.1977); *Barnes v. Osofsky,* 373 F.2d 269, 272 (2d Cir.1967)). A material omission from a registration statement is actionable if the omitted facts (1) were required by SEC regulations to

---

**5.** Because § 12(a)(2) only protects purchasers from sellers, the § 12(a)(2) claims are brought only on behalf of Diagnostek shareholders who exchanged their Diagnostek stock for shares of Value Health.

be stated therein, or (2) were necessary to make the disclosures in the registration statement not misleading. 15 U.S.C. 77k(a); *In re N2K Inc. Sec. Litig.*, 82 F.Supp.2d 204, 207 (S.D.N.Y.2000).

The standard for determining materiality of an omitted fact is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix 'of information made available.'" *TSC Industries, Inc. v. Northway*, 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *see also Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 731 (2d Cir.1987). Materiality "does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote," *TSC Industries*, 426 U.S. at 450, 96 S.Ct. 2126, and, at the same time, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993); *see In re Northern Telecom Ltd. Sec. Litig.*, 116 F.Supp.2d 446, 458 (S.D.N.Y. 2000). Materiality requires that the fact would have "assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries*, 426 U.S. at 450, 96 S.Ct. 2126. The issue of materiality is a mixed question of law and fact. *Id.* Only if the established omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is the issue of materiality appropriately resolved as a matter of law. *Id.*

When determining whether a prospectus failed to disclose a material fact, the prospectus must be read as a whole. *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir.1996). The "'central issue ... is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together would have misl[ed] a reasonable investor about the nature of the [securities].'" *Id.* (quoting *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir.1990)).

### a. *Diagnostek's New Jersey Contract*

■ The plaintiffs claim that omissions concerning the financial condition of Diagnostek, specifically in relation to the New Jersey Contract and other smaller contracts, were material omissions that were required to be stated or that were necessary to make the risk disclosure and fairness recommendation statement not misleading.

The Prospectus included information about the losses on the New Jersey Contract. The Prospectus disclosed $3 million in losses already incurred on the New Jersey Contract and the $9.6 million reserve created for losses that were expected over the course of that contract. VH Ex. 1, at 24. Thus, the Prospectus disclosed a total loss of $12.6 million on the New Jersey Contract.

Diagnostek informed Value Health of the problems with the New Jersey Contract on May 16, 1995. Based on that information, the merger exchange ratio was renegotiated down by 6%. The Prospectus disclosed information about the loss, the reserve, and the bases used to determine the new exchange ratio. Pls. Ex. 3, at 24, 27. Value Health was aware of the New Jersey Contract problem and made shareholders and potential investors aware of it in the Prospectus. No reasonable jury could find, therefore, that information about the losses taken on the New Jersey Contract was omitted from the Prospectus.

The plaintiffs argue, however, that the anticipated loss on the New Jersey con-

tract was actually much higher than the $12.6 million disclosed in the Prospectus and thus, the loss disclosed as well as the risk disclosure statement and the fairness recommendation were misleading. To support their argument, the plaintiffs refer to three pieces of evidence. First, the plaintiffs reference a May 18, 1995 Value Health memorandum, which discusses a review of Diagnostek's financial results and projections. The memo states that "[a]ssuming an average loss of 400k per month for the remaining 33 months, this contract is expected to lose over $13mm." Pls. Ex. 12.

Second, the plaintiffs cite notes dated May 22, 1995 which reference "NJ" and state "[c]urrent run rate $370,00 loss per month X 34 months = $12.5 + 4Q loss = $15.5 m total loss." Pls. Ex. 39. There was no testimony given with respect to the notes and no evidence provided as to the basis for the notes or the estimates in them.

Third, the plaintiffs reference the May 25, 1995 letter from Mark Schorr, Diagnostek's outside counsel, to a representative of the State of New Jersey. Pls. Ex. 34. In that letter, in an attempt to renegotiate the contract due to Diagnostek's mistake in bidding, Schorr stated that the loss on the contract would be $15 million in its initial three years. *Id.* at 2.

The plaintiffs thus provide evidence that, in May 1995, the initial projections of loss on the New Jersey Contract ranged from $13 million to $15 million. Such evidence is insufficient to survive summary judgment, however, because the issue is not whether any other projections of loss existed but whether there is a genuine issue of material fact regarding whether the amount disclosed in the Prospectus was misleading. The defendants argue that, while some projections estimated a loss greater than that disclosed in the Prospectus, the plaintiffs provide no bases for those projections. Further, the defendants also argue that, after a review of the contract, projections supported by an independent audit and made closer to the date of the Prospectus than any of the above-referenced documents estimated that the necessary loss reserve was $9.6 million, as disclosed in the Prospectus. According to the defendants, the plaintiffs offer no evidence of a genuine issue of material fact as to whether that projection was false or misleading.

■ On June 7, 1995, Schorr wrote a follow up to his May 25, 1995, letter to the state of New Jersey, providing the loss projection for three years of the contract.[6] VH Ex. 51. The letter included an Independent Auditors' Report compiled by KPMG Peat Marwick, LLP, for Diagnostek and a schedule to support the loss projection for three years on the New Jersey contract. *Id.* The independent auditor's report projected a $9.6 million loss over the first three years of the New Jersey Contract. *Id.*

On July 27, 1995, Andrew Masetti, the Executive Vice President and Chief Financial Officer for Diagnostek, wrote a letter to Barry Smith, Value Health's Chief Executive Officer. VH Ex. 19. Masetti was

---

6. The plaintiffs argue that Schorr's second letter is inadmissible and should not be considered by the court in deciding these motions. On summary judgment, the court may not consider inadmissible evidence. *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142 (2d Cir.2000). However, even if Schorr's letter is not otherwise admissible, the court would admit the document under Fed.R.Evid. 807 because there is no challenge to its authenticity, it is offered as evidence of a material fact, it is more probative on the point for which it is offered than any other evidence which the defendants can procure, and it would be unjust to allow the first letter in and not allow the second. Fed.R.Evid. 807.

informing Smith about operating issues facing Diagnostek. *Id.* In the letter, Masetti stated that "[o]ur original projection of $9.6MM was based on implementing ... procedures before September 1995 ... At this time, the $9.6MM is achievable *only if* the above actions are taken immediately." *Id.*

Schorr's second letter, sent after the documents on which the plaintiffs rely, demonstrates that, after calculation and review by an independent auditor, the projected loss was $9.6 million. Masetti's letter to Smith demonstrates that he was relying on that projection up to the time he was leaving Diagnostek, a day before the closing and a month after the Prospectus was issued. The plaintiffs provide no evidence that suggests the $9.6 million estimate was false or unreasonable. Nor do they provide any evidence of the bases for the initial projection to which they refer. Even construing the evidence in the light most favorable to the plaintiffs, it establishes only that one initial projection was higher than that relied upon by the defendants in the Prospectus. Demonstrating that initial projections of a loss may have been different than the projection finally relied upon is insufficient to support a claim under §§ 11 and 12(a)(2). *See e.g., Glassman v. Computervision Corp.,* 90 F.3d 617, 631 (1st Cir.1996) ("alleged deviations from internal forecasts, without more, do not produce a duty to disclose"). A reasonable jury could not find that the higher projections revealed in the plaintiffs' evidence were anything other than internal forecasts and, therefore, could not find that those forecasts were necessary to disclose to make the Prospectus not misleading.

■ The fact that loss reserves beyond the amount disclosed had to be taken on the New Jersey Contract is also insufficient to survive summary judgment. Alleging that a contract did not perform as predicted is insufficient to support a claim under §§ 11 and 12(a)(2). *See Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 8 (2d Cir.1996). To show misrepresentation, the plaintiffs must prove more than that the contracts failed to perform as predicted. *Id.; see also Friedman v. Mohasco Corp.,* 929 F.2d 77, 79 (2d Cir.1991). Just as a plaintiff cannot prove "fraud by hindsight" under § 10(b) of the Securities Exchange Act of 1934, a plaintiff cannot prove that a statement was untrue merely by demonstrating that, in hindsight, a prediction was wrong. *Olkey,* 98 F.3d at 8 (citing *Jackson National Life Ins. Co. v. Merrill Lynch & Co., Inc.,* 32 F.3d 697, 703 (2d Cir.1994)); *see also Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994). Because the most a reasonable juror could find is that the predictions made about the New Jersey Contract in the Prospectus were subsequently demonstrated to be wrong, it could not find a violation of §§ 11 or 12(a)(2).

■ To the extent that the plaintiffs also claim that losses suffered by Diagnostek on other contracts should also have been disclosed, the court finds that those losses were not required to be disclosed. The plaintiffs claim that losses on additional contracts needed to be disclosed, but cite to only of the three capitated contracts losses. While those contracts did suffer losses immediately prior to the merger, on the whole, Diagnostek's contracts were profitable. "A company is generally not obligated to disclose internal problems because [t]he securities laws do not require management to bury the shareholders' in internal details." *In re Northern Telecom Ltd. Sec. Litig.,* 116 F.Supp.2d 446, 458 (S.D.N.Y.2000) (quoting *In re Convergent Techs. Sec. Litig.,* 948 F.2d 507, 516 (9th Cir.1991)). Diagnostek had hundreds of contracts. DeSantis, Ex. 17, at 28–29.

Diagnostek was not required to provide shareholders with the details of the performance of every one of those contracts.

■ Finally, the statements made by Patricelli after the merger are insufficient to establish a genuine issue of material fact regarding whether information about Diagnostek's financial condition was a material omission from the Prospectus. In the Value Health 1995 Annual Report, Patricelli said, in reference to the merger, "we didn't spot all the problems—we blew it" and noted that the company had made "organizational and management changes so such acquisition oversights won't happen again." Pls. Ex. 14, at 2. In addition, in a December 5, 1995 article in *The Wall Street Journal,* Patricelli was quoted as saying there were "shortcomings of our due diligence." Pls. Ex. 41. While it may now seem clear that the merger had detrimental effects on Value Health, that is not the relevant inquiry. *Carter–Wallace, Inc. Sec. Litig.,* 220 F.3d 36, 42 (2d Cir.2000) (citing *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978)). " 'The determination of materiality is to be made upon all the facts as of the time of the transaction and not upon a 20–20 hindsight view long after the event.' " *In re Union Carbide Class Action Sec. Litig.,* 648 F.Supp. 1322, 1327 (S.D.N.Y.1986) (quoting *Spielman v. General Host Corp.,* 402 F.Supp. 190, 194 (S.D.N.Y.1975)). As discussed above, the plaintiffs have failed to establish a genuine issue of material fact regarding whether, at the time the Prospectus became effective, any additional information about Diagnostek's financial status was required to be disclosed or required to made the fairness recommendation or risk disclosure statement not misleading.

### b. *Value Health's Ford Contract*

The plaintiffs make three different allegations under §§ 11 and 12(a)(2) with regard to Value Health's Ford Contract. First, the plaintiffs allege that Robert Patricelli's statement regarding the Ford Contract in Value Health's 1994 Annual Report was false and misleading in violation of §§ 11 and 12(a)(2) because the Annual Report was incorporated into the Prospectus. Second, the plaintiffs allege that failing to include information about the anticipated loss on the contract was a material omission required to be disclosed in the Prospectus. Third, the plaintiffs allege that the information about the anticipated loss was necessary to make the risk disclosure and fairness recommendation not misleading.[7]

### i. **Annual Report**

■ The court finds first that the letter from Patricelli in the 1994 Annual Report is not actionable under §§ 11 and 12(a)(2). In a letter to shareholders at the beginning of the Annual Report, Patricelli stated that, because of the renegotiation of the Ford Contract, it would be restored to profitability. Pls. Ex. 4, at 5. The court finds that the letter to shareholders and, therefore, the statement the plaintiffs object to were not incorporated into the Prospectus and, thus, cannot be the subject of §§ 11 and 12(a)(2) claims.

---

**7.** The plaintiffs argue that the court must infer that material information about the Ford Contract was omitted because there is evidence that some documents regarding the Ford Contract were destroyed. The Value Health defendants admit that a Value Health employee discarded some boxes of documents before he knew about the lawsuit or the need to preserve documents. The plaintiffs had the opportunity to examine the employee. The plaintiffs provide no evidence that the documents were destroyed intentionally, nor do they provide evidence of what the alleged documents would prove. *See Kronisch v. United States,* 150 F.3d 112, 128 (2d Cir. 1998). The court therefore finds no reason to draw any inference from the alleged document destruction. *Id.*

Value Health attached a copy of the complete 1994 Annual Report as an exhibit to its Form 10–K in order to reference specific information in the report. Pls. Ex 3. The regulations require that, if a registrant chooses to incorporate information by reference, the "[m]aterial incorporated by reference ... [must] be clearly identified in the reference by page, paragraph, caption, or otherwise." 17 C.F.R. § 240.12b–23(b). The Form 10–K was incorporated into the Prospectus. Pls. Ex. 3, at 3. In its Form 10–K, Value Health only specifically identified certain parts of the 1994 Annual Report to be incorporated by reference. Pls. Ex. 21. None of the referenced pages included Patricelli's statement. Because the statement was not incorporated by reference in the Form 10–K, it was not incorporated into the Prospectus and thus is not actionable as a §§ 11 or 12(a)(2) claim.

### ii. Material Omission Required to be Disclosed

■ The plaintiffs argue that, because Value Health knew it would lose money on the Ford Contract prior to the date of the Prospectus, the information about that loss was required to be disclosed in the Prospectus.

The court finds that Value Health's projection about the Ford Contract was not required to be disclosed in the Prospectus. There is no dispute that Value Health complied with the mandatory disclosure obligations by timely reporting their quarterly results to date, including the first quarter of 1995. The plaintiffs allege that Value Health suffered a $1.3 million loss on the Ford Contract in the quarter ended March 31, 1995. Such losses were therefore reflected in the financial results reported for that quarter and disclosed with the Prospectus. Value Health also publicly announced the problems with the Ford Contract in its 1994 Annual Report. Pls.

Ex. 4. Thus, Value Health complied with disclosure requirements regarding its present and past losses on the contract.

The remaining issue is thus whether Value Health was required to disclose the fact that it projected a $4.3 million future loss on the Ford Contract. The SEC regulations do not require that a company disclose every projection regarding future performance of a contract. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir.1997); *Glassman v. Computervision Corp.*, 90 F.3d 617, 630–31 (1st Cir.1996). Under Regulation S–K of the Securities Regulations, "[m]anagement's discussion and analysis of financial condition ... [must] [d]escribe any ... significant economic changes that materially affected the amount of reported income ..." and must "[d]escribe any known trends and uncertainties that ... the registrant reasonably expects will have a material ... unfavorable impact on net sales or revenues." 17 C.F.R. § 229.303(a)(3)(i)-(ii). However, under the instructions to the regulation, "[r]egistrants are encouraged, but not required, to supply forward-looking information." *Id.* Instruction 7. The instruction distinguishes forward-looking information from "presently known data which will impact upon future operating results, such as known future increases in costs of labor or materials." *Id.* Thus, courts have found that "[t]he federal securities laws do not obligate companies to disclose their internal forecasts." *In re Northern Telecom Ltd. Sec. Litig.*, 116 F.Supp.2d 446, 458 (S.D.N.Y.2000); *accord Burlington Coat Factory*, 114 F.3d at 1432; *Glassman*, 90 F.3d at 630–31. "The regulatory structure seeks to encourage companies to disclose forecasts .... However, where it comes to affirmative disclosure requirements, the current regulatory scheme focuses on backward-looking hard 'information', not forecasts." *In re Bur-*

*lington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1432 (3d Cir.1997); *accord Northern,* 116 F.Supp.2d at 459 (no duty to disclose internal problems merely because those problems are potentially significant); *In re Convergent Techs. Sec. Litig.,* 948 F.2d 507, 515–16 (9th Cir.1991). The defendants argue that the information about the projected losses on the Ford Contract was the type of forward-looking information that Value Health was not required to disclose.

With regard to this argument, the plaintiffs rely on notes from an April 12, 1995 Value Health meeting on Ford Savings Strategies. Pls. Ex. 27. The meeting notes include an analysis of the Ford Contract 1995 Forecast that explained the anticipated losses. Pls. Ex. 27, at FR34458–34459, 34472. The explanations included, for example, some products being delayed, some products having patents expire without a generic replacement readily available, and overaggressive price discounting. *Id.* The forecasts projected a gross margin loss of $471,000.00 and a net margin loss of $4.3 million for the year, but excluded the anticipated benefits of various savings programs not yet implemented at the date the forecasts were prepared. *Id.* The anticipated savings for programs that were not yet implemented included $3.0 million total for four initiatives, and another either $3.2 million or $1.4 million from resolution of an enrollment issues. *Id.* Taking the savings programs into consideration, Value Health was projecting a gross profit margin on the contract of $3.9 and $5.7 million, and a net margin profit of between $0.1 and $1.9 million.

Value Health's auditors, Coopers & Lybrand, projected a $1.5 to $2.0 million savings in the "best case" savings programs and $1.4 to $2.8 million savings for resolution of the enrollment issue plus $147,000.00 for underpaid premiums.

Starting with the $4.3 projected net loss, Coopers was thus projecting a net margin ranging from $1.3 million loss to $650,000.00 gain. The evidence thus demonstrates that the projected loss was a forecast used by Value Health to develop strategies for making the Ford Contract profitable.

The plaintiffs also rely on a July 28, 1995 memo from Dave Wurzer to the Value Health Board of Directors regarding the 1995 second quarter results and forecasts. Pls. Ex. 28. The memo from Wurzer stated that "Ford utilization continued to trend higher ... [but][m]ore aggressive utilization management steps are scheduled to come on line in the second half of 1995." Pls. Ex. 28, at 2. Again, this merely evidences possible losses would be countered by planned saving strategies.

The plaintiffs do not provide any evidence that the $4.3 million loss figure was based on any known variables, only that it was an internal forecast used to develop savings strategies. Further, the plaintiffs do not provide any evidence that the savings plan projections were any less reliable than the $4.3 million projection or that Value Health did not plan to implement those strategies. The $4.3 million projection and the savings plan projections were forward-looking internal projections. Because " '[t]he federal securities laws impose no obligation upon an issuer to disclose forward-looking information such as internal projections, estimates of future performance, forecasts, budgets, and similar data[,]' " *Glassman v. Computervision Corp.,* 90 F.3d 617, 631 (1st Cir.1996) (quoting *Shaw,* 82 F.3d at 1209), Value Health was not obligated to disclose the internal forecast of a $4.3 million loss on the Ford Contract upon which it based its savings strategies. Therefore, no genuine issue of material fact exists regarding whether Value Health omitted a fact about

the Ford Contract that was required to be stated in the Prospectus.

### iii. Fairness Recommendation and Risk Disclosure

 The plaintiffs allege that the information about the Ford Contract was required to make the Fairness Recommendation in the Prospectus not misleading. In the Prospectus, Value Health stated that the board of directors had determined that the merger was fair to, and in the best interests of the Value Health shareholders. "[F]airness-opinion liability may not be premised on material omissions alone; rather, plaintiffs must make some sort of showing that, because of the omissions, the fairness opinion was rendered misleading." *Freedman I*, 958 F.Supp. at 752. The plaintiffs must demonstrate that the statement of opinion was "incorrect or misleading as to both its objective and subjective aspects." *Id.* at 753. That is, in order to demonstrate that the fairness recommendation was an untrue statement of material fact, the plaintiffs must show that the terms of the merger were unfair and that the Value Health defendants were at least reckless in believing that the merger was fair. *See Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1131 (2d Cir.1994); *Mendell v. Greenberg*, 938 F.2d 1528, 1529 (2d Cir.1990).

Construing the facts and making all reasonable inferences in the light most favorable to the plaintiffs, the court assumes for this discussion that the information about the $4.3 million projected loss was material. The issue is thus whether a genuine issues of material fact exists regarding the objective and subjective incorrectness of the fairness statement.

 The Value Health defendants argue that the plaintiffs cannot demonstrate a genuine issue of material fact regarding whether or not the Value Health directors believed the merger was "fair to, and in the best interests of," Value Health and its stockholders or whether they were reckless in arriving at their belief that it was. "Reckless conduct is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care' . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977)).

The plaintiffs fail to provide evidence of a genuine issue of material fact as to whether the Value Health directors believed the merger was unfair because of Value Health's Ford Contract at the time the Prospectus became effective. Even if Value Health believed it would suffer the $4.3 million loss, there is no evidence that it believed that loss made the merger less than fair to its shareholders. Revealing the anticipated loss would seemingly have made the merger agreement more favorable to Value Health shareholders. The plaintiffs do not provide any evidence to suggest otherwise. Therefore, no reasonable juror could find that the Value Health directors did not believe or were reckless in believing the merger was fair to the Value Health shareholders.

 The Value Health defendants argue that the plaintiffs also fail to demonstrate a genuine issue of material fact regarding the objective incorrectness of the fairness statement. The Value Health defendants argue, and the plaintiffs do not dispute, that Diagnostek's performance was improving in the second quarter of 1995 and met market expectations. The plaintiffs argue that the New Jersey Contract made the merger unfair regardless of Diagnostek's overall performance. How-

ever, the only evidence offered to support this conclusion is Diagnostek's performance subsequent to the date the Prospectus became effective. As discussed above, such evidence is insufficient to support a misrepresentation claim. *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 8 (2d Cir.1996). The plaintiffs fail to establish a genuine issue of material fact as to whether the fairness recommendation was objectively untrue at the time it was made.

 The plaintiffs allege that the Risk Disclosure statement was misleading because the projected Ford Contract losses were not disclosed. The Prospectus contained a section that outlined various risk factors. VH Ex. 3, at 14–17. In that section, under the heading "Impact of Healthcare Costs; Certain Contracts," the defendants disclosed that there could be no assurance that future changes would not "cause expenses associated with such agreements to exceed revenues or projected targets and have a material adverse effect on the ... financial condition of Value Health or Diagnostek." Pls. Ex. 3, at 14. The plaintiffs allege that Value Health's failure to disclose the internal projection of a $4.3 million loss on the Ford Contract made this statement misleading because present, as opposed to future, circumstances were causing expenses to exceed revenues in relation to that contract.

The Value Health defendants argue that the statement was not misleading because Value Health anticipated it would break even or earn money on the Ford Contract once the savings plans were implemented. The court agrees.

The central issue is not whether the particular statement made in the risk disclosure was "literally true," but whether the representations, "taken together and in context, would have misl[ed] a reasonable investor ...." *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir.1996). As discussed above, companies are not typically required to disclose internal forecasts or projections. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir.1997); *Glassman v. Computervision Corp.*, 90 F.3d 617, 630–31 (1st Cir.1996). Thus, Value Health did not have to disclose its projections or savings strategies. The plaintiffs provide no evidence that Value Health did not rely on the savings strategies or implement them. Nor do they provide any evidence that the projections for the savings strategies were less reliable than the $4.3 million loss projection. All of the projections made in relation to the Ford Contract—whether the $4.3 million loss or the $650,000 gain— were forward-looking forecasts, none of which the plaintiffs can demonstrate were more reliable than any other.

In the context of the entire Prospectus, therefore, the Risk Disclosure was not misleading. The statement warned shareholders of exactly the risk they claim was not disclosed—that changes could cause contracts to lose money. Pls. Ex. 3, at 14. The savings strategies may have been unsuccessful and the plaintiffs might be unhappy about it, but that is not the basis of a section 11 or 12(a)(2) claim. *Olkey*, 98 F.3d at 7–8. The Risk Disclosure disclosed the possibility that Value Health's contracts might be unsuccessful in the future. No genuine issue of material fact exists as to whether it was, in this respect, misleading.

With regard to all of the plaintiffs' theories under §§ 11 and 12(a)(2), even construing the facts and making all reasonable inferences in the light most favorable to the plaintiffs, no reasonable juror could find that the Prospectus contained an untrue statement of material fact, omitted to state a material fact required to be stated therein, or omitted to state a material fact

necessary to make the statements therein not misleading. Therefore, the court grants the defendants' motions for summary judgment as to the §§ 11 and 12(a)(2) claims.[8]

## 2. Section 14(a) of the Securities Exchange Act of 1934

Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and Rule 14a–9 promulgated thereunder, 17 C.F.R. § 240.14a–9, make it a violation of the 1934 Act to solicit proxies by means of communications rendered misleading by a material misrepresentation or omission. Section 14(a) is designed "to prevent management or others from obtaining authorization for corporate action by means of deceptive and inadequate disclosure in proxy solicitation." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

█ Only the Bash plaintiffs brought a § 14(a) claim. They allege that § 14(a) of the 1934 Act was violated because of material omissions and misleading statements in the Joint Prospectus and Proxy Statement, issued to obtain shareholder authorization for the merger, injured Diagnostek shareholders who voted to approve the merger. Accepting for purposes of deciding the defendants' motions the plaintiffs' argument under *Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir.2000), the Value Health defendants may be liable to the Diagnostek shareholders under § 14(a). *Id.* at 173–78. Because § 14(a) imposes liability on any person who "permit[s] the use of his name to solicit any proxy," the statute encompasses Value Health, which issued a Joint Prospectus and Proxy Statement with Diagnostek to the Diagnostek shareholders. 15 U.S.C. § 78n(a). Where a defendant permits the use of its name in a "manner substantially connected to the proxy solicitation," it may be held liable under § 14(a) for misstatements contained in the proxy materials. *Lewis v. Byrnes*, 538 F.Supp. 1221, 1224–25 (S.D.N.Y.1982); *see also Securities and Exchange Comm. v. Falstaff Brewing Corp.*, 629 F.2d 62, 66–70 (D.C.Cir.1980) (finding proxy statement liability where there is a "substantial connection between the use of the person's name and the solicitation effort"). Construing the facts in the light most favorable to the plaintiffs, Value Health's interest in the merger and participation in preparing the Joint Prospectus and Proxy Statement are sufficient to establish such a substantial connection and, therefore, liability under § 14(a).

█ To prevail on a Section 14(a) claim, a plaintiff must show (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Because, as the court found under §§ 11 and 12(a)(2), no reasonable juror could find that the Prospectus, which included the proxy statement, contained a material misrepresentation or

---

8. Because the Bash plaintiffs' claim against Value Health and the individual Value Health officers under New Mexico Securities Act ("N.M.S.A.") § 58–13B–32 substantially parallels the omission claim under §§ 11 and 12(a)(2), the court grants summary judgment in favor of the defendants under the N.M.S.A. § 58–13B–32 for the reasons stated above.

Because the court grants summary judgment in favor of the defendants on the above grounds, it need not reach the issue, which the defendants raise, concerning whether the Diagnostek Officer defendants can be considered a seller for purposes of § 12(a)(2).

omission regarding either Value Health or Diagnostek, the Bash plaintiffs cannot establish a genuine issue of material fact as to the first element of their § 14(a) claim against any defendant.

Further, the Bash plaintiffs § 14(a) claim against Diagnostek and the Diagnostek Officer defendants fails because no genuine issue of material fact exists concerning loss causation. The plaintiffs do not come forward with any evidence that Diagnostek or any individual Diagnostek defendants knew about any of the alleged problems at Value Health. *Freedman I,* 958 F.Supp. at 759. Thus, the Diagnostek defendants and Diagnostek can only be liable under § 14(a) for failing to disclose information about Diagnostek's financial condition, specifically in relation to the New Jersey Contract.

In order to succeed on their § 14(a) claim, the plaintiffs must be able to prove that the information about the New Jersey Contract would have influenced the Diagnostek shareholders to vote against the merger. *Minzer v. Keegan,* 218 F.3d 144, 149 (2d Cir.2000). The plaintiffs cannot prove such loss causation because knowing that Diagnostek was overvalued in the merger price would not have made a reasonable Diagnostek shareholder any less likely to favor the merger and may have made them more likely to favor it. *Id.* Thus, the Bash plaintiffs cannot prove the second element of their § 14(a) claim as to the Diagnostek defendants.[9] The defendants' motions for summary judgment on this claim are therefore granted.

### 3. Sections 10(b) and 20 of the Securities Exchange Act of 1934

Section 10(b) and Rule 10b–5 promulgated thereunder make it unlawful to make any untrue statement of a material fact in connection with the purchase or sale of any security. Section 20 of the 1934 Act imposes controlling person liability for acts in violation of § 10(b). Section 10(b) makes it unlawful:

> [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 specifies that the statute prohibits "[making] any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . ." 17 C.F.R. § 240.10b–5.

To state a claim under § 10(b) or Rule 10(b)–5, the plaintiffs must prove that the defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which the plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re Int'l Bus. Machs. Corporate Sec. Litig.,* 163 F.3d 102, 106 (2d Cir.1998). "A failure of proof on any one of these . . . essential elements of plaintiffs' claims 'necessarily renders all other facts immaterial' and requires summary judgment in favor of defendants." *In re Northern Telecom Ltd. Sec. Litig.,* 116 F.Supp.2d 446, 455 (S.D.N.Y.2000) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

---

9. Although it is not clear to the court if the Bash plaintiffs are also claiming that Value Health knew of Diagnostek's alleged problems with the New Jersey Contract and are liable for not disclosing those problems, such a claim fails for the same reason that it fails against the Diagnostek defendants—the plaintiffs cannot establish loss causation.

The plaintiffs allege that the defendants violated § 10(b) and Rule 10(b)–5 in the following three ways: (1) by omitting the information about Diagnostek's New Jersey Contract and Value Health's Ford Contract from the Prospectus; (2) by reporting in the 1994 Annual Report that the Ford Contract would be restored to profitability; and (3) by stating in a June 5, 1995 press release that there had been a "full review" of Diagnostek's earnings potential and that Diagnostek was a "thriving business."

#### a. *Omissions from Prospectus*

The § 10(b) omission claims are based on the same allegations made under §§ 11 and 12(a)(2). Because, as the court found in Part B.1., the plaintiffs have failed to establish a genuine issue of material fact concerning whether the defendants made material omissions or misstatements in the Prospectus, no reasonable jury could find for the plaintiffs with regard to the first element of these § 10(b) claims.

#### b. *1994 Annual Report*

 The plaintiffs further claim that the statement made by Robert Patricelli, Value Health's Chairman of the Board and CEO, in a letter accompanying Value Health's 1994 annual report was false and misleading. In the letter, Patricelli stated that Value Health's Ford Contract had been renegotiated "at a significant rate increase that will restore that contract to profitability." VH Ex. 8, at 3.[10]

The plaintiffs cannot survive summary judgment on this claim for two reasons. First, the plaintiffs have not provided any evidence that Patricelli acted with the requisite intent in making the prediction that the rate increase obtained from Ford in January 1995 would restore that contract to profitability. Second, Patricelli's statement is supported by data that was available at the time and was, therefore, not a misstatement.

Unlike §§ 11 and 12(a)(2), § 10(b) requires that plaintiffs prove that the defendant acted with the requisite intent in making a materially false or misleading statement or omitting a material fact. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000); *Chill v. General Elec. Co.*, 101 F.3d 263, 266 (2d Cir.1996). In order to prove the element of scienter, the plaintiffs must show that the defendants made misrepresentations or omissions with the "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see AUSA Life Ins. Co. v. Ernst and Young*, 206 F.3d 202, 207 (2d Cir.2000). The plaintiffs can prove scienter by adducing evidence that the defendants had "motive and opportunity to commit fraud" or by presenting "circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). To qualify as reckless, the conduct must have been " 'highly unreasonable,' representing 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir.2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978)). The plaintiffs have not provided any evidence of Patricelli's intent, either by direct evidence or by evidence of motive and opportunity, nor do

---

**10.** The court notes that the challenged statement was that the rate increase "will restore" the Ford Contract to profitability, not that the contract "had been restored" to profitability as the plaintiffs characterize it in their Memorandum of Law in Opposition to Summary Judgment. *See* Pls. Ex. 4.

they provide any circumstantial evidence of conscious misbehavior or recklessness.

The only evidence the plaintiffs offer in this regard concerns the $4.3 million loss projection, which evidence comes from meetings and documents prepared after the release of the Value Health 1994 Annual Report that contained Patricelli's statement. *Compare* Pls. Ex. 4 *with* Pls. Exs. 27, 28. There is no evidence that there were any future loss projections when Patricelli made his statement. Because the projections were made after the release of Patricelli's statement, no reasonable juror could base a finding of intent on those projections.

Even if there were projections at the time of Patricelli's statement, he had a reasonable basis for the statement he made. Value Health's ValueRx subsidiary had provided pharmacy benefit management services to Ford since at least 1985. ValueRx lost money on the Ford Contract in 1994 and renegotiated the contract in early 1995 at a 19% rate increase. Based on that renegotiation, ValueRx projected gross and net margin profitability on the Ford Contract through the end of 1995. Relying on the renegotiation, Value Health executives, including Patricelli, believed the Ford Contract would be profitable in 1995 and the plaintiffs offer no evidence to the contrary. While, as the plaintiffs argue, one projection subsequently in April anticipated a $4.3 million loss on the Ford Contract, that projection excluded various savings programs that Value Health planned to implement. With the savings strategies, Value Health projected a net margin profit on the Ford Contract of $0.1–$1.9 million. Value Health's auditors, Coopers & Lybrand, projected a net margin on the contract ranging from a $1.3 million loss to a $650,000.00 gain. VH Ex. 24.

"[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance. and future prospects." *Novak*, 216 F.3d at 309 (citing *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir.1999)). In this instance, Patricelli's statement regarding the renegotiation of the Ford Contract was consistent with reasonably available data and no genuine issue of material fact exists regarding any intent of Patricelli to deceive. Thus, no reasonable juror could find scienter with regard to the Ford Contract.

### c. June 5, 1995 Press Release

 The plaintiffs make two allegations with respect to the June 5, 1995 press release. First, the plaintiffs allege that Patricelli's statement that the renegotiated exchange ratio took into account "a full review of the ongoing earnings potential of Diagnostek" violated § 10(b) and Rule 10(b)–5. According to the plaintiffs, the review conducted by Value Health was not a full review, and Value Health and Patricelli were at least reckless in calling it full. Second, the plaintiffs allege that both Value Health and DeSantis violated § 10(b) by stating that Diagnostek was a "thriving business."

The statements challenged by the plaintiffs are "single, vague statement[s]." *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 810–11 (2d Cir. 1996). As such, they are not sufficiently concrete or specific to be material under the first element of a § 10(b) claim. *In re Northern Telecom Sec. Litig.*, 116 F.Supp.2d 446, 466 (S.D.N.Y.2000). A " 'promotional phrase … devoid of any substantive information' " is distinct from a "material representation that a reasonable investor might consider important."

*Freedman,* 958 F.Supp. at 760 (quoting *Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir.1995)). "While statements containing simple economic projections, expressions of optimism, and other puffery are insufficient, . . ., defendants may be liable for misrepresentations of existing facts." *Novak,* 216 F.3d at 315 (internal citations omitted).

Patricelli's statement about a "full review" of the on-going earnings potential of Diagnostek was made in the context of a discussion about the losses on the New Jersey Contract. There is no dispute that Value Health sought and received information about the New Jersey Contract from Diagnostek. In his deposition, Masetti testified that, prior to the June 5, 1995 press release, he provided Value Health with "any information about the New Jersey contract . . . that had been requested." Pls. Ex. 20, at 79. The information disclosed included reports and estimates about employee levels, costs, and margins. *Id.* Value Health did conduct a review of Diagnostek's earnings potential in light of the New Jersey Contract. Further, the plaintiffs have not proffered any evidence to suggest that Value Health's review of the losses taken on the New Jersey Contract was not a "full review." Therefore, a reasonable jury could not find that Patricelli's statement that such a review was conducted was a misstatement.

In addition, the plaintiffs fail to establish that a genuine issue of material fact exists regarding Patricelli's intent to deceive in making the "full review" statement. The plaintiffs again cite statements made by Patricelli after the merger, including the statement in the 1995 Annual Report that "we didn't spot all the problems—we blew it," Pls. Ex. 14, at 2, and the statement in a December 5, 1995 article in *The Wall Street Journal,* that there were "shortcomings of our due diligence." Pls. Ex. 41.

While the statements provide evidence of what Patricelli believed by the end of 1995, they do not provide any evidence of Patricelli's intent as of June 5, 1995. Therefore, no reasonable juror could find that Patricelli acted with the requisite intent to satisfy the second element of a § 10(b) claim.

The statement that Diagnostek was a "thriving business" was puffery because of the context in which it was made and the lack of market reaction to the statement. Like the "full review" statement, this statement was made in contradistinction to the disclosure that the merger ratio had been renegotiated because Diagnostek's New Jersey Contract would be losing money. At the time it was made, Diagnostek had enjoyed nine quarters of increased earnings and net revenues. During the prior year, Diagnostek's core business had, as stated, experienced a 65% revenue growth. Stating that, aside from the New Jersey Contract losses, Diagnostek's business was thriving was thus supported by financial data. In light of the fact that the New Jersey Contract was a new contract, Diagnostek's performance separate from that contract was indicative of its overall performance. In addition, the statement was qualified by the information about the losses on the New Jersey Contract. In this context, such a statement is too vague to be anything other than puffery. *San Leandro,* 75 F.3d at 810–11.

In addition, the plaintiffs provide no evidence that DeSantis acted with the requisite intent in making the "thriving business" statement. The plaintiffs therefore fail to establish that a genuine issue of material fact exists regarding scienter, the second element of a § 10(b) claim.

The plaintiffs have failed to establish that genuine issues of material fact exist under § 10(b) with regard to the Prospectus, Value Health's 1994 Annual Report, or the June 5, 1995 Press Release. The defen-

dants' motions for summary judgment with regard to the §§ 10(b) claims are granted. In the absence of § 10(b) liability, there can be no individual liability under § 20. Therefore, the defendants' motions for summary judgment with regard to the § 20 claim are also granted.[11]

### 4. Common Law Fraud and Negligent Misrepresentation

The Bash plaintiffs brought common law claims against all defendants under theories of "fraud and deceit" and "negligent misrepresentation." *Bash* Complaint, Dkt. No. 83, at Counts 7 and 8. The court dismissed the claims against Diagnostek and Diagnostek officers as to the class but permitted them to proceed as individual claims. *Freedman III*, at 23–25. The defendants argue that the common law claims against Value Health and Value Health officers and directors should similarly be dismissed as to the class. In addition, the defendants argue that the court should grant summary judgment as to the individual common law claims because there is no genuine issue of material fact regarding whether the plaintiffs actually relied on the misrepresentations made by the defendants. The plaintiffs do not address the common law claims in their response to the defendants' motions for summary judgment.

Under the summary judgment analysis, once the moving party establishes that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to "set forth specific facts showing that there is genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Because the plain-

tiffs do not address the common law claims, they do not put forth any facts to show there is a genuine issue for trial regarding reliance and fail to satisfy their burden. Summary judgment as to the common law claim of fraud and deceit and as to the common law claim of negligent misrepresentation is therefore granted.

### C. Plaintiffs' Motion for Partial Summary Judgment

The plaintiffs have moved for summary judgment against Value Health based on the claims made under §§ 11 and 12(a)(2) of the Securities Act of 1933. For the reasons discussed above at Part B.1, the plaintiffs' motion for partial summary judgment is denied.

## III. CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment [Dkt. Nos. 206, 211] are GRANTED. The motions are granted as to all claims under §§ 11, 12(a)(2) and 15 of the Securities Act of 1933, § 14(a) of the Securities Exchange Act of 1934, §§ 10(b) and 20 of the Securities Exchange Act of 1934 and Rule 19b–5 promulgated thereunder, N.M.S.A. §§ 58–13B–30, 58–13B–31, 58–13B–32, and 58–13B–40, and the common law claims.

The plaintiffs' motion for partial summary judgment [Dkt. No. 213] is DENIED.

The clerk is hereby directed to close the case.

**SO ORDERED.**

---

**11.** As the court found in *Freedman III*, N.M.S.A. §§ 58–13B–30 and 58–13B–31 "substantially parallel the claims under section 10(b) and Rule 10(b)–5." *Freedman III*, 2000 WL 630916 at *7. In addition, N.M.S.A. § 58–13B–40 parallels the § 20 control person lia-

bility provision. For the reasons the court granted summary judgment on the §§ 10(b) and 20 and Rule 10(b)–5 claims, the court grants summary judgment as to the claims brought by the Bash plaintiffs under N.M.S.A. §§ 58–13B–30, 58–13B–31, 58–13B–40.